Judge Mills
delivered the opinion of the court.
This is an action of trespass, assault, battery, and false imprisonment; and the issue is made upon the freedom or slavery of Lydia, the plaintiff in the court below.
Lydia was born a slave in Kentucky, in the year 1805, *468 and belonged to John Warrick, a citizen of this state, who removed hence in the year 1807 to the late territory of Indiana, where he settled, shortly after the 17th September of that year, together with Lydia and her mother, whom he took with him, and whom he kept till the 6th of December, 1814, when he sold his right to Lydia in that territory to Thomas Miller, likewise a resident there, who sold her to Robert Todd, a citizen and resident of Kentucky, who brought her to Kentucky and sold her to John W. Rankin, the defendant below, now plaintiff in error, who still holds and claims her as a slave for life, she being a person of color, he having had knowledge when he purchased her from Todd, of the foregoing facts.
The parties in an agreed case admitted the foregoing facts, and also made part of the record two acts of the legislature of the territory of Indiana; the first act passed the 17th September, 1807, entitled “An act concerning the introduction of negroes and mulattoes into this territory.” The second was passed on the 14th December, 1810, entitled "An act to repeal an act entitled, ‘an act for the introduction of negroes or mulattoes into this country,' and for other purposes."
The first of the foregoing acts provides as follows:
§ 1. It shall and may be lawful for any person, being the owner or possessor of any negroes or mulattoes, of and above the age of 15 years, and owing service and labor as slaves in any of the states and territories of the United States, or for any citizen of the said states or territories purchasing the same, to bring the said negroes or mulattoes into this territory.
”§ 2. The owner or possessor of any negroes or mulattoes, as aforesaid, and bringing the same into this territory, shall, within thirty days after such removal, go with the same before the clerk of common pleas of the proper county, and in presence of said clerk, the said owner or possessor shall determine and agree with his or her negro or mulattoe upon the term of years which the said negro or mulattoe will or shall serve his or her said owner or possessor, and the said clerk is hereby authorized and required to make a record thereof in a book which be shall keep for that purpose.”
The 3d section of said act simply provides, that if any negro or mulatto so brought in, should refuse to make such agreement, or to serve the owner, it should be lawful for *469 the owner to remove such negro or mulatto to any state or territory where slavery was tolerated by law, within sixty days.
The 5th section declares, that if any owner of such negro or mulatto should fail to act according to the preceding sections, he should forfeit all claim and right to the service of such negro or mulatto.
The 6th section reads as follows:—
“Any person removing into this territory, and being the owner or possessor in any negro or mulatto, as aforesaid, under the age of fifteen years, or if any person shall hereafter acquire a property of any negro or mulatto, under the age aforesaid, and who shall bring them into this territory, it shall and may be lawful for such person, owner or possessor, to hold the said negro or mulatto to service or labor, the males until they arrive at the age of thirty-five, and the females until they arrive at the age of thirty-two years.
"§7. Any person removing any negro or mulatto into this territory, under the authority of the preceding section, it shall be incumbent on such person, within thirty days thereafter, to register the name and age of such negro or mulatto with the clerk of the court of common pleas for the proper county."
The eighth section provides, that if such negroes or mulattoes shall be removed from one county to another in the territory, the owner should make a similar register in the county to which they were removed.
The ninth section imposes a fine of fifty dollars on any person who should fail to comply with the requisites of the two preceding sections. The tenth section imposes a similar fine for failing to perform the duties required by the act. The eleventh section provides, that the clerk should take bond with approved security from the owner making such registry, conditioned that such negro or mulatto, after their time of service had expired, should not become chargeable to the county. The twelfth section lays a severe penalty on any person who shall remove such negro or mulatto without the territory without their consent, first obtained before a judge. The thirteenth section regulates the fees of the clerk for the services performed under the act. The fourteenth provides, that children born of parents of color, so indented, should serve, if a male, till 30 years of age, and if a female, till twenty eight: and the *470 fifteenth section provides, that a law of the territory respecting apprentices, in case they were misused by their master or mistress, should apply to such children.
The act of 1810, before recited, simply repeals the foregoing statute, and lays severe penalties on any person removing, or attempting to remove, negroes and mulattoes without their consent obtained before some justice of the peace
Warrick, after his removal to Indiana, before the clerk of the county where he resided, made the agreement with Flora, the mother of Lydia, to serve him 20 years, which was duly recorded; and in November, 1807, registerered Lydia as a slave under 15 years of age, according to the afore-recited act of 1807, which was likewise recorded there, and authenticated copies are made part of this record.— Warrick continued to reside in Indiana during the time he held Lydia as aforesaid, and for some time afterwards.
Upon the foregoing agreed facts, the cause was submitted to the court below, who gave judgment for Lydia, for one cent damages, agreed by the parties, and costs: to reverse which this writ of error is prosecuted.
In deciding this question, we disclaim the influence of the general principles of liberty, which we all admire, and conceive it ought to be decided by the law as it is, and not as it ought to be. Slavery is sanctioned by the laws of this state, and the right to hold them under our municipal regulations is unquestionable. But we view this as a right existing by positive law of a municipal character, without foundation in the law of nature, or the unwritten and common law. If, by their positive provisions in our code, we can and must hold our slaves in the one case, and statutory provisions equally positive decide against that right in the other, and liberate the slave, he must, by an authority equally imperious, be declared free. Every argument which supports the right of the master on one side, based upon the force of written law, must be equally conclusive in favor of the slave when he can point out in the statute the clause, which secures his freedom.
The law on which the counsel for Lydia relies, is the ordinance of Congress for the government of the territory north west of the river Ohio. In this ordinance numerous articles are inserted, which are declared to be a compact between the original states and the people and states in said territory. One of these articles is as follows:—
The ordinance establishing territorial governments N. W. of Ohio, secures freedom to all slaves whose master removes with them, and settles in such territory.
"There shall be neither slavery nor involuntary servitude in the said territory, other than in punishment of crimes, whereof the party shall have been duly convicted. Provided always, that any person escaping into the same, from whom labor or service is lawfully claimed in any one of the original states, such fugitive may be reclaimed and conveyed to the person claiming his or her labor as aforesaid.”
If the right of Lydia to freedom rested on a constitutional provision, or the section of a statute of this state existing at the time she first resided here, equally clear as the ordinance recited, no doubt could be entertained of her freedom. The enquiry will then be, as she claims under the ordinance, applicable to the late territory of Indiana, will her right to freedom be equally clear? The words of the ordinance are extremely clear and forcible—“there shall be neither slavery nor involuntary servitude”—a strong mode of expressing that every inhabitant shall be free;—thus using a figure of speech not uncommon, which by expressing what shall not, declares emphatically what shall be. If a slave, then, could exist and reside in the territory, and be there a slave, the ordinance could not be true—for slavery existed, the ordinance notwithstanding. For we cannot recognize the logic that will prove a man free and a slave at the same time—or that slavery can exist without a right or power in some one existing over the slave at the same moment. Where, or in whom, did the right to the servitude or slavery in Lydia exist, when she was in Indiana for the space of seven years? Not in any resident of Kentucky; for no citizen in this state had then any claim to her. Certainly not in Warrick, the citizen of Indiana, who had adopted that country as his own, and who, under the ordinance in question, claimed, and no doubt exercised all the blessings and privileges secured by it. Every atom of property be there possessed had its right of possession and enjoyment based upon that ordinance, which bore the same relation to that territory which a constitution bears to a state. As the right, then, that every person enjoys under our government of possessing his estate free from the control of others, is conventional, and is secured by our constitution, so was the right of Warrick, the domiciled citizen of Indiana, to the estate he there possessed. As between him and Lydia, the compact then spoke equally loud—that she was not his slave—that his right to her was extinct; or in other words, that she was her own. It *472 is true a person may adopt a profession or trade and be called by it, as lawyer, physician or painter, and yet not always be in the exercise of the duties of that profession or calling, notwithstanding he still wears the name; but it is not equally true that there is no slavery existing with the slave when he is not actually engaged in the drudgery incident to his condition. As well might it be said that while a slave of this state reposes in slumber, slavery is not the attendant of his kitchen. A profession or calling is assumed and its duties relaxed at pleasure: but slavery is involuntary, and cannot cease to exist till the right of the master ceases with it. It is not the manual labor of the slave which constitutes slavery, else every laborer would be a slave; but it is the right of another to his labor, whether exercised or not, which constitutes slavery or involuntary servitude This right, then, during the seven years residence of Lydia in Indiana, was not only suspended, but ceased to exist; and we are not aware of any law of this state which can or does bring into operation the right of slavery when once destroyed. It would be a construction without language to be construed—implication without any scrap of law, wriiten or unwritten, statutory or common, from which the inference could be drawn, to revive the right to a slave when that right had passed over to the slave himself, and he had become free. In what situation, then, must Rankin, the plaintiff in error be? The purchaser from Warrick could not receive from him the right of slavery in Lydia, for he had none to convey. She was not the slave of the purchaser while he remained in Indiana after his purchase; and is it to be seriously contended that so soon as he transported her to the Kentucky shore, the noxious atmosphere of this state, without any express law for the purpose, clamped upon her newly forged chains of slavery, after the old ones were destroyed! For the honor of our country, we cannot for a moment admit, that the bare treading of its soil, is thus dangerous, even to the degraded African.
If a right exists it may be coerced, whether acknowledged or not.
But it has been contented in argument, that altho' the compact vested a right to freedom, yet, as it was never acknowledged, and as Lydia was never in its actual enjoyment, the right cannot be coerced. The existence of a right may be equally certain, altho’ it was never acknowledged by those whose interest it is to deny it. If it is acknowledged, it is easier proved—the evidence is strong— *473 but if it is denied, it may be proved by evidence aliunde, and then the remedy ought to be applied with equal force. As well might it be said that the vested right of inheritance in an heir held by an abator or intruder,could have no remedy, because the abator would not acknowledge it, or that a slave which had vested by descent, could not be wrested from an adverse claimant by the heir, because the adverse claimant denied the right, and the heir had never been in the enjoyment of the service of the slave. If rights to property not acknowledged, can thus be coerced by appropriate remedial, much more ought the right to freedom, compared with which, all other rights sink into insignificance. But it is not correct from the face of the record in the present case, that the right of Lydia was never acknowledged by Warrick, on the 17th September, 1807—the legislature of the territory of Indiana, passed the law authorising the introduction of negroes and mulattoes, not slaves, into the territory. The legislature could not have intended to tolerate slavery there, for that body well knew, that the compact forbade it, and that they could not do so. They of course, cautiously avoided using the word slave in the act, except when speaking of them in other states. This act, no doubt, was intended to authorise a temporary servitude of negroes and mulattoes, brought into the territory who had been slaves before their introduction. By the provisions of this act, if a negro or mulatto, over the age of 15 was introduced, the former master might go with such negro or mulatto, before the clerk of the court of common pleas, of the proper county, and then make an agreement with his slaves for a term of service. This agreement the clerk was to record and it had the force of an indenture, and was declared obligatory till the end of the term agreed upon. If the negro or mulatto was under 15 years of age, by another section of the act, he or she, as if supposed by reason of nonage, to be incapable of contracting, for a definite period, was to be registered with the clerk, and thereupon was bound to serve, if a male to the age of thirty five, if a female to the age of thirty two years. This was, no doubt, the contract which the legislature intended the law should make for those supposed to be incapable of contracting themselves. Warrick, accordingly, shortly after his arrival in Indiana, made before the proper officer, the agreement with the mother of Lydia, and recorded it, as contemplated by law, by which she bound him *474 self to service for twenty years, she being then over the age fifteen years — and Lydia, who was then under that age, he registered for the purpose of claiming, not as a slave, but under the law, the temporary service which the law intended to secure. By this title, and not by the title of slavery derived from the birth of Lydia in Kentucky, did Warrick hold Lydia, during her seven years residence in Indiana. In a state such as ours, where we have been habituated to slavery, in black, if we read or hear of an African in another state or territory, bound to servitude of any character, whether limited or otherwise, we are apt to affix to him, not only the appellation, but the legal condition of a slave. When we hear of a white apprentice for the purpose of a trade, or an indented servant to pay for his transportation, such as have existed in Virginia, Pennsylvania, and other states, we never once think of stiling him a slave. We well know the difference. We know he has the right of acquiring or holding property, that he can take an estate by descent or devise, and that he has the right to sue and be sued, and that of trial by jury, and many others of a civil character, which might be enumerated. Precisely such is the situation of the African in the territory of Indiana, or the states where slavery cannot exist. On the abolition of slavery in the state of Pennsylvania, the right to the servitude of the offspring of slaves was reserved until the age of 28 years, and perhaps upwards. But they never were treated as slaves by the courts of that state, as will be seen by adjudged cases in their reporters. Addison, Dallas and Binney. They were treated as foreigners, persons not naturalised, and as indented white servants. Such we believe to have been the case with Lydia and her mother, in the territory of Indiana. Had Lydia or her mother sued, could her adversary, with the ordinance in question, staring him in the face, have pleaded that she was a slave and could not sue? If he could,he must be allowed to prove slavery there, which the ordinance said should not exist. If any benevolent person should have devised an estate to Lydia, when the said ordinance secured to her in common, with the inhabitants of said territory, in express terms, the acquisition and preservation of property, could she not have taken the estate? It is verily believed she could, and indeed, that she could yet hold it there, notwithstanding that it may be contended, that in Kentucky, where her person has been brought, without her consent, she is still a slave! Such *475 then, is deemed to be the situation and rights of Lydia in Indiana, and such Warrick, her former master, acknowledged them to be, and in this very situation, he himself, by his removal and his registry of her name placed her. Is it competent then, for Warrick or the plaintiff, in now claiming under him to gainsary her right to sue here? Is it proper for him or his vendee, now to alledge that her rights were never acknowledged, and her freedom never enjoyed? If an estoppel was ever proper, it is conceived, it ought to be allowed in a case like this
The registry of a slave under the municipal law of Indiaana, & agreeing to accept the temporary servitude of such slave, is an admission of his freedom, and the former owner and his vendee is estoped to deny it.
Whether an agreement between master and servant, securing to the former the temporary services of the latter, be assignable is very questionable: but need not be decided where the issue is formed on the question of slave or no suit.
A person of color entitled to freedom by the municipal law of any state where he has been domiciled, may prosecute his right in any other state.
It has, however, been contended, that if the slavery of Lydia was done away, still the temporary servitude secured by her registry under the laws of Indiana, has not yet expired, and therefore, that her present suit is premature.—It is clear from what has been said, that if the law of Indiana meant to tolerate slavery in Lydia for thirty two years, it is void, because it is against the compact. If it meant to tolerate a temporary servitude, with numerous vested civil and personal rights, as before recited, (and on this construction alone can it be valid) it would not then follow, that the claim to her services were assignable, and that the claim could be enforced against her in her present situation, in favor of her present claimant. Neither would it follow that she could not sue; but the contrary—But it is not deemed necessary to decide this matter. Whenever her master shall appear before this court with, an issue made up, upon his claim to a temporary service, and limited authority over Lydia, derived under the law of Indiana, it will then be time enough to decide upon the validity of his claim. But when he appears, as he now does, holding the affirmative of an issue on the point whether Lydia is a slave, by force of her original birth bonds in Kentucky, he cannot be entitled to a decision in his favor, which may give him a title to Lydia for life.
It has also been contented in argument, that the claim of the plaintiff for freedom, is of a penal character—that it accrued by the laws of another government, and that it cannot be enforced here, or that no remedy ought to be allowed by law, based upon it. To this it is answered, that freedom is the natural right of man, although it may not be his birth right. By the municipal laws of a government it may be taken away, and if it was forfeited by the same municipal law to another master, and that forfeiture partook of the nature of a penalty, there might be some *476 plausibility in the argument, arising from the principles held by some decisions, that one government will not enforce the penalties enacted by another. But even this principle is not admitted to be correct to every extent in the American states, when a right was vested. During the revolutionary war, the slaves and estate of many of the refugees were forfeited by the laws of the states, and they were sold by the order of government. If on the return of peace, any refugees had returned, and had been fortunate enough to regain the possession of his slaves, and escape with them to another state, it is presumed that it would hardly be contended that the owners claiming under the forfeiture, would be deprived of remedy in any of the states to regain the slaves. But, however, this might be, if the right has gone to the slave himself, and there is no law providing a mode for remaking him a slave, it is evident that his freedom would continue, his removal notwithstanding. Free people of color in all the states are, it is believed, quasi citizens, or at least denizens. Although, none of the states may allow them the privileges of office, and suffrage, yet, all other civil and conventional rights are secured to them—at least such rights were evidently secured to them by the ordinance in question for the government of Indiana. If these rights are once vested, in that or any other portion of the United States, can it be compatible with the spirit of our confederated government to deny their existence in any other part? Is there less comity existing between state and state, or state and territory, than exists between the despotic governments of Europe? Among them, it is believed, that a precedent cannot be furnished, of an alien friend, the subject of a foreign power, who was free in his own land, being denied the right of a qualified freedom, when he sojourned abroad. The constitution of the United States, secures this principle between a state, and the citizens of the several states; and it does exist with regard to the inhabitants of territories, although they may not fall within the letter of the federal constitution.
The argument which has been relied on as most formidable, is that arising ab inconvenienti. It is contended that there is no difference between a transient passing, or sojourning in Indiana, under the ordinance in question, and a residence there. That the slave which would be there an hour would be as much under the influence of the ordinance as the one who resided ten years; that if the ordinance *477 could give freedom at all, it could and would do it in a moment when the slave touched the enchanted shore, and that the consequence would be, that the slave of the traveller who attended his master—the slave of the officer who marched in the late armies of the United States—those sent of errands to the opposite shores—or attending their masters while removing beyond the Mississippi through the territory, would all have an equal right to freedom with Lydia; and that, by a decision in her favor, the right of such property would be much jeopardized.
The ordinance applies to the slaves of residents alone, no to those of sojourners or travellers.
This argument will now be scrutinized; and in doing so, the premises will be denied at the threshhold. Make the case as strong as it can be made, and suppose the territory of Indiana to be a foreign government, and wholly unconnected with this, still it would not be difficult to prove that the ordinance in question in force there, could not touch or operate upon the slave of the traveller or sojourner, when construed by the law of nations. Vattel informs us, “That “the state which ought to respect the rights of other nations, and, in general, those of all mankind, cannot arrogate to itself any power over the person of a stranger who “does not become a subject by entering the territory. The “stranger cannot pretend to enjoy the liberty of living in “the country without respecting its laws.” In another section he defines the laws to which the stranger is subject, by telling us that the stranger is allowed access to a foreign country “only on this tacit condition, that he be subject to “the laws; I mean,” says that writer, “the general laws ‘‘made to maintain good order, and which have no relation “to the title of citizen or of subject of the state.” The same author, after pointing out some of the laws to which the traveller or sojourner is or is not subject, concludes by emphatically telling us, that “The property of an individual “does not cease to belong to him, on account of his being in a foreign country, and it still is a part of the totallity “of the wealth of his nation: The pretensions which the “lord of the territory might form in respect to the wealth, “of a foreigner, would be then equally contrary to the rights“ of the proprietor, and to those of the nation to which he “belongs.” He then proceeds to tell us, that the moveables of the stranger are held and pass by the laws of his own country; but those that are immovable, acquired in a foreign land, pass by the laws of the place where they exist. Thus, then, is the claim to the property of the sujourn *478 er preserved, when measured by even the undefined laws of nations. But far different is the rule when derived from the same law, with regard to the inhabitant—even the inhabitant who moves thither with an intent of residing. For the same author tells us, that “The inhabitants, as distinguished from citizens, are strangers who are permitted “to settle and stay in the country. Bound by their residence to the society, they are subject to all the laws of “the state while they reside there, and they are obliged to “defend it, because it grants them protection, though they “do not participate in all the rights of citizens.” Different then is the case of the sojourner from that of him who moves with the intention of residing. The former is subject only to particular laws, and has the title of his property secure, while he who enters and actually resides, is subject to every law. Different also is the case of Warrick, the master of Lydia, and different the relation between him and his slave, and him and that government from the master and his slave, who, for a particular purpose, traverses the soil, or sojourns in Indiana. On the property of the former the ordinance took its full effect; on the property of the latter it could have no force. Warrick removed to, and settled in, Indiana, and for aught that appears, is there yet. There he domiciled himself, and there he domiciled Lydia, without her will anime residendi, and yet his assignee claims, that the laws of the country which he adopted, and whose blessings and benefits he sought and enjoyed, had no effect on the condition of Lydia, it is then deemed incorrect to assume the position that the ordinance might affect the passing slave if it could affect the resident; and that there is no difference between the transient stay of a moment and a fixed residence in the country. There is a difference in fact, and a corresponding difference in law. If nations, amidst all their jealousies and thirst for power, could adopt such rules to govern themselves, with regard to their neighbors, how much stronger is the reason and propriety of the rule, when applied between the different branches of the American family ? Can it be for a moment supposed that any one of them would reject a principle so strongly based in reason, propriety, and the nature of things. Under this rule Lydia will be entitled to her freedom, while the right to the transient slave will remain unshaken, and none of the dreaded consequences would follow. Conformable to this principle, and no other, it is believed, can *479 the ordinance in question be properly construed. It is stilled the “articles of compact between the original states, and the people and states in said territory.” “The inhabitants of said territory shall always be entitled to the benefits of the writ of habeas corpus, &c.” “The inhabitants and settlers in the said territory shall be subject to a part of the federal debts, &c.” These, and many other expressions, in the ordinance, clearly shew, that like most other municipal regulations, it was designed to operate on the inhabitants and settlers of the territory, and on them exclusively; and when the ordinance declares that slavery shall not exist there, it evidently means among the inhabitants and settlers, and not among the travellers or sojourners there. Their case is not affected by the provisions of the ordinance; against them no provision exists
Hardin for plaintiff, Pope for defendant in error.
If the comity between this and the state of Indiana is to have any bearing on this subject, it will be most promoted by this construction. It appears in the record that the territory adopted laws prohibiting the removal of their domiciled negroes. If, then, such are removed, and it is once known that their vested rights are denied by the functionaries of this government, it is calculated to produce retaliatory measures, and to cause them to detain and refuse our transient slaves, who are not, and never were, subject to their municipal regulations, with regard to their resident blacks and resident claimants. In any view of the case, which this court has been able to take, we consider Lydia as free. Not because she acquired that freedom by the laws of Kentucky, but during her absence from the state, by the voluntary and unequivocal acts of her master; and that when it is thus acquired, it ought to be held equally sacred here, whither she is brought against her will, as it would be, had it been her birth-right. It is enough, if it exists now—it is equally as precious, valuable and sacred, as if it commenced with her existence.
The judgment of the court below must, therefore, be affirmed with costs.