TOM DAVIS
vs
TINGLE et al.

---

# Tom Davis, (of color,) *vs* Tingle *et al.*

### APPEAL FROM THE MASON CIRCUIT.

*Slaves.   Emancipation.   Dower.*

JUDGE SIMPSON delivered the opinion of the Court.

IN 1788, a slave named Harriet, then a small girl, belonging to the estate of John Ball, deceased, was allotted to the widow of the decedent as dower.   The allotment was made by the County Court of Faquier county, Virginia.   The widow removed to Kentucky about the year 1796.   In the year 1808, she made a deed of gift of Harriet and other slaves, to H. R. Graham, her son by a second husband; which deed purported to transfer an absolute title in the slaves to the donee.   Harriet is the mother of Tom, the present plaintiff.   In 1826 they were both sold under an execution against H. R. Graham, and purchased by a free man of color, the husband of Harriet and father of the plaintiff; who afterwards, in the year 1834, liberated Tom by a deed of emancipation, regularly admitted to record in the Mason County Court.

The widow of John Ball died in 1836, and shortly afterwards Nicholas Warfield, claiming Tom under a purchase from A. D. Orr, whose wife was one of the heirs of John Ball, took him into his possession and held

TRESPASS VI
ET ARMIS.
*Case* 137.

*July* 26.

Case stated.

| 8bm539 |
| 108  534 |

| 8bm 539 |
| 128   68 |

Tom Davis. vs Tingle et al.

Grounds assumed by complainant for freedom.

him as a slave, until 1845, when he instituted this suit, asserting his right to freedom.

The plaintiff's right to freedom, so far as claimed under the aforesaid deed of emancipation, must depend upon the title which his father had to him at the time it was executed. If, by his purchase, he only acquired the life estate of the dowress, and had not any other right to, or property in Tom, it is evident he could not emancipate him, as that would have the effect of destroying the interest of those in remainder or reversion.

This principle is conceded; but it is contended on behalf of the plaintiff, that the right of the heirs of John Ball to the dower slaves, could not have been asserted successfully against the purchaser under the execution against H. R. Graham; that the slaves were liable to execution, and the purchaser acquired a good and perfect title by his purchase. If he did not, that his subsequent possession for more than five years prior to the execution of the deed of emancipation, perfected his title.

To maintain this assumption, the following grounds are relied upon: First, That H. R. Graham having had the possession of Harriet more than five years, claiming her as his own under an absolute gift from his mother, the boy Tom, who was born during the time, was, as well as his mother, liable for the debts of Graham under the operation of the statute of frauds.

Second, That by the removal of the dower slaves from Virginia to this State, the widow forfeited all her interest therein, and the right to their possession accrued immediately to the persons in reversion, under a Virginia statute enacted in 1785; and that the subsequent possession of five years, by the purchaser from the dowress, claiming the slaves absolutely as his own property, vested the title in him, and was a complete bar to the claim of the heirs.

Third, That one of the heirs being present at the time of the sale under the execution, and not having objected to the sale, or apprised the purchaser of the existance of the reversionary interest, was estopped to claim in opposition to the purchaser.

In regard to the first ground relied upon, it is only necessary to remark that the statute to prevent frauds, has no application to estates created by operation of law, such as a dower estate in slaves, so far as the heirs are concerned, but to those estates exclusively, which are created by the parties themselves.    The reason for the application of the statute in the one case, does not exist in the other.    The fact that the slaves possessed by the widow, belonged to her husband at the time of her death, manifests the extent of her interest in them, and the right of the heirs in reversion, without any writing of record, defining the respective interests of the parties.    But in the other case, there being nothing in the relative position of the parties, or in known or ascertainable facts, from which the pretended right of the original proprietor, inconsistent with the apparent right of the person in possession can be deduced, to permit the validity of such pretended right, without an instrument of writing of record declaring it, would encourage the commission of frauds on the rights of creditors and subsequent purchasers; to prevent which the statute becomes necessary, and is applied in such a case, for their security and protection.    The very language of the statute, (1 *Stat. Law*, 741,) proves that it was not intended to apply to estates created by operation of law, but only to those created by the parties, the language used being, that so far as creditors and purchasers are concerned, the absolute property shall be taken to be with the possession, unless a loan, reservation, or limitation of use or property, be declared by will or deed in writing, duly proved and recorded.    Now a dower estate not being created either by deed or will, its limitation for life, and the estate of those in reversion in the property, cannot be declared through the medium of either of the instruments mentioned in the statute.

It is well settled, that the time which elapses during the continuance of a life estate, or any adverse possession during that period, cannot be relied upon as forming a bar to the right of those in reversion or remainder. The statute of limitation never attaches until the cause

The statute of frauds has no application to estates created by operation of law, but only to those created by act of the parties.

Adverse possession during the life of tenant for life, presents no bar to the right of tenant in remainder or reversion, no cause

Tom Davis
vs
Tingle et al,

of action having arisen: *Boone* vs *Dykes*, (3 Mon. 537;) *Betty* vs *Moore*, (1 Dana, 235.)

of action arises, and no cause of action accrues to those interested after the death of the proprietor of the life estate, until such life estate terminates: *Boone* vs *Dyke's legatees*, (3 *Monroe*, 537;) *Betty* vs *Moore*, (1 *Dana*, 235.)

Admitting this to be the general principle, still it is contended it does not save the interest of the heirs in this case, from the operation of the statute, because the widow, by the removal of the slaves from Virginia, forfeited her interest in them, and a right of action immediately accrued to the heirs.

Tho' persons entitled to slaves after a dower estate is determined, might sue after an act of tenant in dower forfeiting that estate, they are not bound to do so: *King* vs *Mims*, (7 Dana, 273.)

It has, however, been held that the forfeiture inflicted by the statute was designed to be exclusively for the benefit of those in reversion or remainder, and if the Courts in this State would enforce a forfeiture denounced by the laws of Virginia, which is at least questionable, still as the statute intended to confer on them an optional right, and not to force on them an estate, different from that which the law gave them; and they did not enforce, or attempt to enforce the forfeiture, but rested upon their original right until the termination of the life estate, they were wholly unaffected by the lapse of time, or length of possession held by those deriving their title from the widow: *King* vs *Mims*, (7 Dana, 273.)

The owner of property who stands by and permits another to buy it of a third person cannot, nor can his privies, thereafter assert title thereto–this rule extends to infants and *femes covert*: (*Story's Eq.* 1 vol. 377, and cases there cited.)

It was proved that Alexander D. Orr and his wife, she being one of the children and heirs of John Ball, deceased, were present when the plaintiff was sold under execution and purchased by his father. That the sale was of the absolute property in him, and the price paid was his full value at the time, and that Orr and wife remained silent in reference to their interest in the slave, made no claim to him or any disclosure on the subject, nor any objection to the sale. It was also proved that H. R. Graham had the possession of Harriet for many years, claiming her as his own, during which time the plaintiff was born: that Graham was believed in the neighborhood, to be the absolute owner of the slaves, and that the claim of Ball's heirs was unknown to the bidders. The principle is well settled, that if the real owner of property, knowingly permits

it to be purchased by a third person, without notice of his claim, from the apparent owner who is in possession, he will not be permitted afterwards to assert his title against such innocent and *bona fide* purchaser. To allow him, under such circumstances, to dispute the validity of the purchase, would be obviously unjust. The law, therefore, regards him as bound by the sale, and neither he nor his privies are at liberty, afterwards, to assert his title in opposition to it. And neither infancy nor coverture will constitute any excuse for the party, guilty of the concealment, for neither infants nor *femes covert* are privileged to practice deceptions on other innocent persons: (1 *Vol. Story's Equity*, 377, *and cases cited.*)

It does not appear whether or not the wife of A. D. Orr survived her husband. Nor is it material, for if her husband had died before the termination of the life estate, and had made no disposition of the slaves in his lifetime, although she would have taken them as the survivor, yet being present at the sale, and having remained silent, she would not, any more than her husband, have a right to attack its validity.

But no question in relation to her right to assert her title arises in this case. Her husband in his lifetime, sold and transferred the slaves to Nicholas Warfield. That sale passed her title to the slaves, but placed the vendee in no better condition than his vendor was. So far as he derives title under Orr, he is not at liberty to dispute the validity of the title acquired by the purchaser at the sale under execution, if it were made under the circumstances before mentioned. Warfield also claims title to the plaintiff, by virtue of a purchase and transfer from Mary Graham, the widow. But as she had previously deeded the same slaves to her son, any title she may afterwards have acquired by the death of another son of her first husband, intestate and without children, would enure to his benefit, and Warfield would obtain nothing by his transfer, particularly as he must have had notice of the previous conveyance.

If then, the purchase made by the father of Tom was valid against Orr, and also against Warfield, who claims

If a widow entitled to slaves as dower slaves, makes a deed of gift purporting to convey an interest in fee, and afterwards acquire by operation of law, an interest in the slaves, such interest passes to her vendee.

Tom Davis
vs
Tingle et al.,

A deed of emancipation by a part owner of a slave is effectual to that extent: *Thompson* vs *Thompson*; (4 B. Monroe, 502.)

And an emancipation of a majority of the joint owners of a slave will make him a free man and a conversion: *Oatfield* vs *Waring*, (14 John. Rep. 188.)

But he is still a slave until by the act of the other part owner the manumission becomes complete.

under him by a transfer executed subsequent to the Sheriff's sale, the deed emancipating the plaintiff must be operative against Warfield, who is not in an attitude, if the foregoing facts are true, to deny the title of the grantor in the deed.

The proof shows that Ball left three other children besides Mrs. Orr, two daughters and a son. The son is proved to have died many years since, childless and intestate. Whether the other heirs acquiesce in the emancipation of the plaintiff, or assert title to him, does not appear. If Warfield has no available title, and therefore is not tenant in common with them, he cannot claim to hold possession of the plaintiff in that character, by virtue of this title, or for their benefit. If the purchaser at the Sheriff's sale acquired the title as against Orr and wife, he thereby became tenant in common with the other heirs, and had a right to the possession of the slave, even after the expiration of the life estate of the widow, and could emancipate him to the extent of his interest, a deed of emancipation by a part owner of a slave being effectual *pro tanto*: *Thompson* vs *Thompson*, (4 B. Monroe, 502.)

And the emancipation of a slave by two of three joint owners, or by any majority in interest of the joint owners, would of itself make him a free man. The emancipation would be considered a destruction of the tenancy in common, and a conversion of the slave, so far as the other proprietors were concerned: *Oatfield* vs *Waring*, (14 John. Rep., 188.)

Still, however, the plaintiff notwithstanding his partial manumission, continues a slave, until his emancipation is made complete by the act of the other joint owners, at which time, and not previously, the partial manumission, enures to the benefit of the slave, and becomes operative. Any other doctrine would produce the strange anomaly of an individual existing in a state of freedom and slavery at one and the same time, elements totally incompatible with each other, and incapable of being united together in the same person. The act of emancipation by one part owner, who is the proprietor of less than a moiety, being inconsistent with the right

of the others to the services of the slave, whose interest is greater, must yield to this right, and be postponed in its operation, until such time if ever, as it may become efficacious by the concurrence of the other owners, or so many of them as may be necessary for this purpose.

But the other heirs of Ball, so far as it appears from the evidence in the case, having asserted no claim to Tom since the death of the widow, and consequent termination of the life estate in 1836, although he had been emancipated two years previously, the jury might have presumed his manumission by them, notwithstanding he was wrongfully held in slavery by Warfield part of the time, as all presumptions should be indulged in favor of human freedom.

There is, however, another aspect of the case, decisive in favor of the right of the plaintiff in error, to his freedom. His father, after he had purchased him and his mother, viz: in the year' 1831, removed to the State of Ohio, took them both along with him, and resided there for the space of two years. His wife became dissatisfied, and he afterwards returned to this State, bringing his family with him. By his residence in Ohio, the plaintiff became free, and being once free, his return to this State did not make him again a slave. The residence of a slave, with the consent of his owner, in any of the States formed out of what was known as the North Western Territory, results in his freedom, by virtue of the ordinance of 1787, as was decided by this Court in the cases of *Rankin* vs *Lydia*, (2 *Marshall*, 467;) and *Bush's representatives* vs *White and wife*, (3 *Monroe*, 104.) And this effect is given to such residence, not only by the Courts of this State, but by those of Virginia, Louisiana, Mississippi, and other slave States.

The only rational doubt that can exist in this case, in relation to the effect of the plaintiff's residence in Ohio, arises from the fact, that his father was not his absolute owner, there being other persons who had an interest in remainder. But it must be recollected that he was the proprietor, not only of an estate in him during the

Tom Davis
vs
Tingle et al.

life of the tenant in dower, but also by his purchase at the Sheriff's sale of an undivided third in remainder. Besides having removed him to Ohio without objection, the consent of the other part owners may be implied from their failure to resist or oppose it. Indeed when the condition of Harriet and Tom, at the time of their removal is considered, the mother feeble and declining, and the child then but a few years old, sickly, delicate, and of but little value, no great sacrifice was made in giving such assent, it being, under the circumstances, but the mere dictate of humanity.

If the owner of a dower interest in a slave domicile such slave in Ohio during the life estate, does the slave thereby become entitled to freedom?

But if the father had owned no other than the dower interest in Tom, as the removal out of the State by a purchaser, and not by the dowress herself, as the law then stood, would not have created a forfeiture of this interest to the reversioners, as was held in the case of *Gale's heirs* vs *Miller*, (3 *Monroe*, 418,) it may well be doubted whether the plaintiff's residence even then, would not have been sufficient to secure to him his freedom. His father would have had a right to him during the life of the dowress; that right might have continued as long as he lived. During that time he could surrender all claim to him and consent that he might be free. The law of the place where he was domiciled permitted him to enjoy that freedom without regard to the rights of the reversioners. In this respect it differs from the law of this State, which will not permit the tenant for life by a deed of emancipation, to destroy the right of those in remainder or reversion. When he became domiciled in Ohio, his right to freedom was vested, and from the very nature of the right when it once attaches and takes effect, it must remain permanent, and is not liable to subsequent divestiture.

There is no confliction between these views and the doctrine and principles asserted in the case of *Graham* vs *Strader, &c.*, (5 *B. Monroe*, 173.) There the reasoning all applies to a case where the slave is taken, for a mere temporary purpose, to a State where slavery is prohibited, with an intention not of residence, but to bring him back again as a slave to this State. In such a case it was held, even if the slave by appealing to the

laws of the foreign State, while within its jurisdiction, could release himself from the control of his master, and become free, yet if he failed to do so, and returned voluntarily, his condition would be unchanged, and he would still remain a slave. That, however, is a very different question from the one presented here. The plaintiff was taken to Ohio, not for a mere temporary purpose, but to reside permanently. The right of pro-perty which his father had in him, enabled him to retain him there a sufficient length of time to make that the place of his domicil. It being a right that continued during the life of another, it might have continued during the life of the plaintiff. It is a much higher interest in legal estimation, than one that is limited in its duration to a certain number of years, and expires at a fixed and certain period. But we do not deem it necessary to pursue the enquiry further, or to decide in this case what its effect would have been, had the removal occurred under the circumstances mentioned, and without the consent, either express or implied, of those interested in reversion or remainder.

Since the act of 1835, (3 *Stat. Law*, 553,) prohibiting the removal of a slave from this State, by a purchaser claiming under the title of a widow, possessed of such slave under the title of dower, and making such removal a forfeiture of all right to those entitled in reversion or remainder, when made without their consent, a purchaser of the dower interest would not be enabled by a removal into another State, to impart any right of freedom to the slave, inasmuch as the act of removal would deprive him of all right to him, and those entitled in reversion, would immediately thereupon, have a right to his possession and control.

Objections were made upon the trial, and questions raised as to the admissibility of some of the evidence offered, but as some doubt exists whether or not the objections were acted on by the Court, there being a good deal of obscurity on the subject in the bill of exceptions, and as the judgment will have to be reversed, the fourth instruction given by the Court upon the trial, at the instance of the defendant, being inconsistent with

the principles of this opinion, and as the same questions
may not again occur upon another trial, we will not, at
this time, notice these objections further.

Wherefore, the judgment is reversed and cause re-
manded, that a new trial may be awarded and further
proceedings had in conformity with this opinion.

*Hord and Payne* for appellant; *Beatty* for appellees.

---

CHANCERY.

Case 138.

September 21.

Case stated in
the bill.