584 METCALFE'S REPORTS.

Nunnally et al. vs. White's executors et al.

CASE 29—PETITION EQUITY—DECEMBER 27.

# Nunnally et al. vs. White's executors et al.

### APPEAL FROM MADISON CIRCUIT COURT.

A will gave to a devisee a defeasible fee in land and in a slave, subject to divestiture if she should die without issue, upon which event the fee was to vest in her co-devisees or their children then living. This was an executory devise; and neither the conveyance of the property by the holder of the defeasible fee, nor the possession of it by the ‖purchaser claiming it as his own, no matter how long continued, before the happening of the contingency upon which the executory devise was to take effect, could defeat the rights of the executory devisees. (5 *Littell*, 312.)

A warranty bars the warrantor from claiming land under a subsequently acquired title, and also bars his heirs to the extent of assets received from the warrantor.

A will provides that if any of the devisees, (the testator's children,) die without issue, such estate as they may receive by the will should be equally divided among those that may be alive, and the children of those then dead. A portion of them, in consideration of love and affection, signed a writing stipulating that they disclaimed the contingent interest which might accrue to them under the will as to the portions allotted to two of the devisees. The contract was afterwards executed by one of the covenantors. *Held*—that such execution rendered the contract obligatory upon the others, even conceding that they would not otherwise be bound. (7 *B. Mon.*, 213.)

Mutual covenants of warranty, contained in a deed of partition of land, form a sufficient consideration for each other, and bind the covenantors capable of contracting.

In equity, devisees and legatees are barred by the testator's warranty, to the extent of assets real or personal. This is equally applicable to covenants relating to the title to slaves. The principle upon which the heir is barred, is equally applicable to legatees and devisees. And the criterion is not merely the value of the land or slaves claimed, at the date of the warranty, but the value of the assets real or personal.

That a rule of law or equity is embodied in the Revised Statutes does not raise a presumption that such was not the law before.

Husband, surviving the wife, is entitled to her choses in action, and the equitable right thereto will pass to his executors, although they could not maintain an ordinary action thereon without administering upon her estate. See the opinion for a state of case, where, in equity, the executors of the husband were allowed the benefit of a covenant to the wife, without administration upon her estate.

A *feme covert* cannot bind herself by her warranty in a deed for land. (16 *B. Mon.*, 637; 2 *Met.*, 139.)

A tenant in common, owning three-fifths of certain slaves, devised to them their freedom. *Held*—that the tenancy in common was thereby destroyed. It was a conversion by the testator, which deprived his former co-tenants of any right to the slaves, and turned their claim thereto into a money demand against his estate. (14 *John.*, 188; 8 *B. Mon.*, 544.)

Where a right of the wife has been converted into a demand for money, to which, if recovered, her husband would be entitled, the claim will be barred by his warranty.

Covenants real run with the land, and if broken, the right of action is in the transferee of the covenantee.

TURNER, for appellants, cited 4 *Littell*, 207; 4 *Dana*, 253; 5 *Litt.*, 312–13; 3 *Mon.*, 538; *act of* 1798, 1 *Stat. Law*, 110; *Rev. Statutes, page* 542, *sections* 18, 19 *of chap. on Real Estate;* 1 *Dana*, 57; *Tucker's Blackstone*, 2d *volume*, 303; *act of* 1792, 1 *Statute Law*, 316.

C. F. BURNAM, and W. H. CAPERTON, for appellees, cited 8 *B. Mon.*, 544; 7 *Ib.*, 213; 4 *Littell*, 207; 4 *Dana*, 251; 4 *Har. & Johns.*, 430; 4 *Munford*, 63; 1 *Bibb*, 168; 2 *Bibb*, 448; 4 *Mon.*, 97.

JUDGE BULLITT DELIVERED THE OPINION OF THE COURT:

The will of Galen White, who died in 1831, gave $50 to Galen and Mary, children of his deceased son, Jefferson White, and the residue of his estate to his five children, Jeremiah, Lucy, Betsy, Polly and Patsy, and his grand-daughter Laurina White ; and enjoined it upon his "said five children and granddaughter, Laurina," to pay to his grand-children, Galen and Mary, children of Jefferson White, deceased, $720 upon their attaining the age of twenty-one years; and then declared as follows : "It is further my will that, should any of my before mentioned children and grand-child, Laurina White, die without issue, that such of my estate as they may receive by this will be equally divided among those that may be alive, and the children of those then dead, in equitable proportions." By a codicil he gave all the money, notes and accounts, that might be in his possession at the time of his death, to his said five children.

On the 6th November, 1833, four of said devisees, viz : Jeremiah, Betsy, Lucy with her husband John Duncan, and Laurina with her husband, Jacob Huguely, by a written instrument under seal, in consideration of one dollar and of love and affection for Polly and Patsy White, disclaimed all their interest in "that part of the will of Galen White which refers to or mentions that if his daughters Polly or Patsy should die without heirs of their body, that that part of his estate should fall back to his children or heirs," and bound their heirs, so far as

they might have assets, to "disclaim all right and title to the said section in any way."

On the 16th November, 1833, Polly and Patsy White, in consideration of mutual love and affection, executed a similar instrument in favor of each other.

An attesting witness, the only one living, testifies that love and affection formed the only consideration for said instruments except as to Betsy Hill, (formerly White,) who, he says, received a cow from Polly and Patsy White for signing the first named instrument.

Neither instrument was acknowledged for record, though both were deposited in the county court clerk's office.

On the 24th March, 1834, the said devisees, and the said husbands of Lucy and Laurina, divided the land devised by the will, by a deed of partition, with warranty, which was duly acknowledged and recorded.

By said deed thirty-eight acres were allotted to Polly White; and by a parol partition there was allotted to her a slave called *America*, who is now living as well as seven children she has since borne.

Polly White married Durret White, and in 1836 they conveyed, with warranty, said thirty-eight acres of land to Wm. Terrill for $1,180.

Durret White, sometime after his marriage, purchased a slave, called *Martha*, who is now living as well as several children she has since borne. There is conflicting evidence upon the question whether he paid for *Martha* with means derived from his wife under Galen White's will, or with other means of his own.

Polly White died in 1857, without issue, and Durret White died in 1858, leaving a will by which he declared *America* and *Martha* and their children free, and provided for their removal from Kentucky.

During the life of Polly White, Patsy White, who had married John Tribble, died, leaving children and no estate; Jeremiah White died, leaving issue and a will, by which he gave his whole estate to his wife for life or widowhood, and then to

his children; and John Duncan, the husband of Lucy White, died leaving issue and a large estate.

This suit was brought, after Durret White's death, by the children of Jeremiah White and of Patsy Tribble, and by Galen and Mary, children of Jefferson White, to recover an alleged interest, under Galen White's will, in the said slaves and said thirty-eight acres of land. Betsy Hill and Huguely and wife filed answers, claiming a like interest. Mrs. Duncan filed a disclaimer.

Terrill answered, relying upon his aforesaid purchase from Durret and Polly White in 1836, and his possession ever since, and upon the aforesaid instruments executed in 1833 and 1834, in bar of the claim of the plaintiffs and co-defendants to the land.

*America* and *Martha* and their children filed an answer, claiming their freedom under Durret White's will, and his executors made their answer a counter-claim against the plaintiffs and some of the defendants, claiming a judgment for the value of the land, if any, which they might recover from Terrill.

The court below decided that Durret White held the slaves *Martha* and her children as his own property, free from any claim on the part of Galen White's devisees; that Galen and Mary, children of Jefferson White, took no interest in remainder in the estate devised to Polly White, and dismissed the suit as to them; that Betsy Hill was barred by her warranty from claiming any interest in the land or slaves; that Jeremiah White's children were barred to the same extent by his warranty and by assets received from him; that Mrs. Huguely's claim to the land was barred by the deed of 1834; that, as the deed of November 6, 1833, was not properly acknowledged, Mrs. Huguely's claim to one-fifth of the slaves, *America* and her children, was not barred thereby, but that her husband was bound by said instrument for the value of her recovery; and that Patsy Tribble's children, having received no assets from their mother, were entitled to one-fifth of the land and of the slaves, *America* and her children; and appointed a commissioner to allot one-fifth of said land and slaves to Patsy Tribble's children, and one-fifth of said slaves to Mrs. Huguely.

The commissioner made a report as to the partition of said land, and stating the names of said slaves, and the value of each, the aggregate value of the slaves being $5,900; and thereupon the court allotted one of the slaves valued at $1,150 to Mrs. Tribble's children, and gave them a judgment against Durret White's executors for $30 to make one-fifth of the value of said slaves, and allotted to them eight and one-half acres of the land; and allotted two of said slaves to Mrs. Huguely, valued at $1,100, and gave her a judgment against said executors for $80 to make one-fifth of the value of said slaves; and gave to said executors a judgment against Jacob Huguely for said $1,180 recovered by his wife.

The children of Jefferson and Jeremiah White, Huguely and wife, Terrill, Durret White's executors, and *America* and her children, appealed from said judgments.

1. There was no error in dismissing the suit of Galen and Mary White. They took nothing under the will except the pecuniary legacies. This seems too plain to require argument for its support.

2. Even if *Martha* was purchased with means received by Durret White's wife under the executory clause of Galen White's will, it would not, perhaps, necessarily follow that the executory devisees are entitled to *Martha* and her children. But we need not decide this question, as we are not satisfied from the proof that *Martha* was purchased with such means. The circuit judge did not err in refusing to give the claimants a judgment for *Martha* and her children.

3. The will gave to Polly White a defeasible fee in the land and the slave *America*, subject to divestiture if she should die without issue, upon which event the fee was to vest in her co-devisees or their children then living. This was an executory devise, and neither the conveyance of the property by the holders of the defeasible fee, nor the possession of it by the purchaser, claiming it as his own, no matter how long continued before the happening of the contingency upon which the executory devise was to take effect, could defeat the rights of the executory devisees. (*May's heirs vs. Hill*, 5 *Littell*, 312.)

But a warranty bars the warrantor from claiming land under a subsequently acquired title, and also bars his heirs to the extent of assets received from the warrantor. It is however contended by appellants' counsel, upon several grounds, that the court below erred in giving effect to the warranties made by Jeremiah White and others.

(1.) It is contended that there was no consideration for the warranty made November 6, 1833, except love and affection, and that this, as between collaterals, is not a sufficient consideration to support an executory contract.

Whether or not the fraternal relation is of itself a sufficient consideration to support such a contract we need not now decide, because, in our opinion, the contract of 1833 must be supported upon another ground.

The record shows that said contract was signed by Jeremiah White and others in view of the fact that Polly and Patsy White had apparently slight prospect of leaving issue, being unmarried and somewhat advanced in life, and for the purpose of placing them upon a footing of equality with the signers of the contract, all of whom it was supposed would leave issue, and thus convert their defeasible into indefeasible fees. One of the covenantors, Mrs. Duncan, has executed the contract, in behalf of her husband and herself, by filing a disclaimer. The execution of this contract by a part of the covenantors rendered it obligatory upon the others, even conceding that they would not otherwise be bound. (*Graves vs. Graves, 7 B. Mon., 213.*)

As to the land, the mutual covenants of warranty, contained in the deed of partition executed in 1834, formed a sufficient consideration for each other, and bound such of the covenantors as were capable of thus contracting.

(2.) Though the instrument of November 6, 1833, might have been more aptly drawn, it indicates, beyond a reasonable doubt, an intention to warrant the title of Polly and Patsy White against the warrantors and their heirs, and in our opinion is not void for uncertainty.

(3.) It is clear from the proof and from the instrument itself that said warrantors did not expect Polly and Patsy White to

relinquish or warrant to them ; hence there was no fraud nor failure of consideration growing out of the fact that Polly and Patsy White only warranted to each other.

(4.) It is contended that Jeremiah White's children are not barred, to any extent, by his warranty, because they received nothing by *descent*, his estate having been devised to his wife for life, and then to his children.

The only decision of this court, cited in support of this position, is that in the case of *Logan vs. Moore*, (1 *Dana*, 57.) In our opinion that decision has no bearing on the question before us. The only question there was, whether the heir was barred to the extent only of his own inheritance from the warrantor, or to the extent of the entire inheritance of himself and his five co-heirs ; and the only point decided, was, that he was barred to the extent only of his own inheritance.

But the act of 1798 (1 *Stat. Law*, 110,) is relied upon as showing that the heir is only barred by the inheritance of real estate from the warrantor. Such, probably, would be the law if that statute was the only law applicable to the subject ; but it is not.

It is enacted by the Revised Statutes, that a claimant of land shall be barred for the value of any estate received by devise, descent, or distribution from the warrantor. (*Chapter* 80, *section* 18.) Whether or not this applies to the case before us, in which the warranty was made before, and the devise after, the enactment of the statute, we need not decide, because our opinion is, that such was the rule before. So many previous rules of law and equity are embodied in the Revised Statutes, that we cannot admit, as contended by appellants' counsel, that the enactment just mentioned raises a presumption that such was not the law before.

By the common law, a lineal warranty, commencing by disseizin, did not bar the heir, though he had assets by descent. A lineal warranty by tenant in tail barred the heir if he had assets, and not otherwise. But a collateral warranty, or a lineal warranty not made by a tenant in tail, nor commencing by disseizin, barred the heir even without assets descended.

· In our opinion the act of 1798, declaring that alienations and warranties of land should not pass a greater estate than the warrantor might lawfully convey, but that his heir should be barred for the value of any heritage descended from him; was designed to overturn the harsh rules just mentioned, (whereby, in many cases, including those like the one before us, the heir, having title not derived from the warrantor, was barred, though nothing had descended to him from the warrantor,) and not for the purpose of relieving heirs or devisees from just liabilities imposed by other statutes and rules of law and equity.

There was no necessity for naming devisees in the act of 1798, either for the purpose of barring them when they had assets by devise from the warrantor, or of relieving them when they had received nothing from the warrantor; because, in the former case, they were barred by the act of 1792, (1 *Stat. Law*, 778,) and in the latter case, they were relieved by the common law.

Formerly there was but one class of warranties with reference to which the question of assets was material, viz: lineal warranties by tenants in tail; and in such cases the heir was barred only to the extent of his *inheritance* from the warrantor, because—1st. Devisees were not bound for the testator's liabilities; and 2d. There could be no personal action upon a warranty of land; personal estate could not be subjected therefor even in the hands of the warrantor; the warrantee's remedy was by *voucher* or writ of *warrantia chartæ*, in which nothing but land could be recovered.

These rules have been changed. It has always been held in this State, that personal actions would lie upon covenants of warranty and other covenants relating to the title to land. (*Booker's adm'r. vs. Bell's ex'r.*, 3 *Bibb*, 173.) Under the common law of Kentucky, an action of covenant lies against the warrantor's executors. Under the act of 1792, *supra*, the same action lies against his devisees; or they may be sued in equity. (*Ellis vs. Gosney's heirs*, 1 *J. J. Mar.*, 348.) And in equity legatees are equally liable, after their legacies have been assented to by the personal representatives. In equity, therefore, de-

visees and legatees should be barred by the testator's warranty, to the extent of assets, real or personal, for the same reason that the warrantor is barred, viz: to prevent circuity of actions.

This conclusion is equally applicable to covenants relating to the title to slaves, upon which personal actions might always have been brought, and for a breach of which, under the statutes of Kentucky, real as well as personal estate may be subjected.

(5.) But it is contended, that at any rate Jeremiah White's devisees should only be barred to the extent of the value of one-fifth of the land and slaves at the date of the testator's covenant, it appearing that the land and slaves have since greatly increased in value.

In our opinion, it might with equal propriety be contended, that the warrantor himself, had he survived Polly White, would only have been barred to the extent contended for in behalf of his devisees.

We need not decide what would have been the criterion of damages if Jeremiah White had warranted the title against, and the property had been recovered by, a stranger.

Where land, sold and conveyed with general warranty, has been recovered by a stranger, the criterion of damages, in a suit against the warrantor, is the price paid; yet the warrantor cannot afterward recover any part of the land, though he may have acquired a superior adverse title, and though the land may have increased ten-fold in value. The law forbids him from claiming the land in violation of his covenant. The same principle applies to his heir or devisee having assets. Both of the authorities cited by appellants' counsel, to prove that the heir is not barred unless he has received land by descent from the warrantor, show that where he has land by descent, he is barred to the extent of the value thereof, and not merely to the extent of the value at the date of the warranty, of the land claimed. (*Logan vs. Moore, supra;* 2 *Tucker's Blackstone,* 303, *note* 8.) And such is the plain meaning of the act of 1798, *supra,* which declares that the heir "shall be barred for the value of the heritage that is to him descended." We need not

cite additional authorities to prove that such was the common law, in cases wherein the question of assets was material. And we have shown that now, in equity at least, the principle upon which the heir is barred is equally applicable to legatees as well as devisees.

(6.) It is, however, contended that, as no party to this action has administered on Polly White's estate, no party to the action is entitled to damages for the breach of Jeremiah White's covenant, and consequently the court below erred in deciding that his devisees were barred.

Durret White, having survived his wife, Polly White, was entitled to her choses in action, including said covenant, and the equitable right thereto passed to his executors. They could not have maintained an ordinary action thereon without administering upon her estate. But, as this was a suit in equity against them; as Polly White's heirs were before the court, and as it may be inferred from the record that she did not owe any debts rendering an administration upon her estate necessary, in our opinion the court below did not err in giving to the executors of Durret White the benefit of said covenant.

And as the interest in real and personal estate given by Jeremiah White's will to his children was worth more than their interest in the land and negroes claimed by them in this suit, the circuit court judge rightly decided that they were barred.

(7.) But the circuit judge erred in deciding that Mrs. Huguely was barred as to the land. Being a *feme covert* she could not bind herself by her warranty. (*Falmouth Bridge Co. vs. Tibbatts*, 16 *B. Monroe*, 637; *Hobbs vs. King*, 2 *Met.*, 139.)

(8.) The circuit judge also erred in adjudging to Mrs. Huguely and to Mrs. Tribble's heirs a part of the negroes *America* and her children. Durret White in right of his wife, owned three-fifths of said negroes, viz: the interests of Jeremiah White, Mrs. Hill, and Mrs. Duncan. His will, declaring said negroes free, destroyed the tenancy in common between him and the Tribbles and Mrs. Huguely, and was a conversion, which deprived his former co-tenants of any right to the negroes, and turned their claim thereto into a money demand

against Durret White's estate. (*Oatfield vs. Waring*, 14 *John. R.* 188; *Tom. Davis vs. Tingle and others*, 8 *B. Mon.*, 544.)

Mrs. Tribble's heirs, having received nothing from their mother, are entitled to one-fifth of the land, and to a judgment against Durret White's representatives for a sum of money equal to one-fifth of what was the value of *America* and her children when Durret White died, with interest from that time, and to one-fifth of the value of their services during the time intervening between the death of Polly White and Durret White.

But neither Huguely nor his wife is entitled to any judgment on account of her interest in said negroes. Her right thereto has been converted into a demand for money to which, if recovered, her husband would be entitled. Hence the claim is barred by his warranty.

It necessarily follows, that the court below erred in giving to Durret White's executors a judgment against Huguely for $1,180, the value of the negroes adjudged to his wife.

4. Huguely's covenant, dated November 6, 1833, only bound him and *his heirs* not to claim the property devised to Polly White. In the deed of partition, made in 1834, he and the other parties covenanted to defend the title against themselves, their heirs, "&c."

Whether or not Mrs. Huguely's recovery of one-fifth of the land allotted to Polly White, can constitute a breach of either of those covenants of her husband, and if so, what should be the criterion of damages for the breach, we need not decide, because those covenants, so far as they relate to the land, run therewith, and if broken the right of action would be in Terrill, and he has not asserted any claim for damages.

5. In answer to the suggestion of counsel, that Durret White's estate should be held liable to the appellants, or some of them, for "the amount of personalty and money" received by him, in right of his wife, from Galen White's estate, it is sufficient to say, that Mrs. Hill's right thereto is barred by her covenant, and that none of the other parties assert any right thereto by their pleadings in this case.

Concerning the rights of *America* and her children, as between them and Durret White's executors and devisees, with reference to the money herein directed to be paid by said executors to Mrs. Tribble's heirs, no question is now before us.

Upon the original appeal the judgment is *reversed* as to the appellants, Huguely and wife, and *affirmed* as to the other appellants. Upon the cross-appeal the judgment is *reversed* as to the cross-appellants Durret White's executors and the negroes Durret, Emily, and Bill, and *affirmed* as to Terrill; and the cause is remanded for further proceedings consistent herewith.

The appellants, except Huguely and wife, must pay the costs of the original appeal. Upon the cross-appeal Durret White's executors are entitled to their costs against Huguely and Patsy Tribble's heirs.