## Oliver, et al. v. Creech's Heirs.

(Decided April 27, 1926.)

### Appeal from Harlan Circuit Court.

Estoppel—Son, Moving from Land to Allow Father to Sell Same, and Making no Claim to Purchasers, Held Estopped from Claiming Title Under Oral Contract with Father and Adverse Possession.—Son, who occupied land originally belonging to his father, and who moved therefrom to allow father to sell same, and made no claim to purchasers until long after father's death, held estopped from thereafter claiming title under parol contract of sale with father and adverse possession.

SAMPSON & SAMPSON for appellants.

H. M. BROCK and W. A. BROCK for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

Jack Creech brought this suit March 20, 1917, to quiet his title to a tract of land, alleging that he was the owner of it and that the defendants were setting up claim to it. The defendants denied the allegations of the petition, alleging that they were the owners of the land, and praying that their title be quieted. On final hearing in the circuit court judgment was entered in favor of Creech. The defendants appeal.

As both the parties claim under Isaiah Creech neither can deny his title, and it is unnecessary to trace the title further. Isaiah was the father of Jack Creech, who claims that his father sold him the land many years ago and that thereafter he held the land in adverse possession for some thirty years. The defendants claim under a warranty deed made by Isaiah Creech on October 6, 1902. The facts are these:

Isaiah Creech owned a large body of land in Harlan county; he had a number of sons and as they married he settled them upon different parts of his tract. Jack Creech married about 1880 and settled on a part of the tract in controversy. He built a house and made a clearing about the house and planted out an orchard. When this controversy first arose he testified on the trial of a forcible detainer case that his father had given him the land, but on the trial of this case he testifies that this was a mistake and he didn't mean to say so; that he had

bought the land from his father and paid him for it. He gave this deposition in 1921 and in that deposition he twice stated that he bought the land from his father twenty-five years before, but when his deposition was retaken he said this too was a mistake and that he bought the land from his father five or six years after he settled there. He testifies that he paid his father for the land by giving him a horse and a sow and doing some work on his house. The proof is that his father's house burned down in 1895 or 1896 and that the work Jack Creech did was work in the rebuilding of the house. The horse was delivered about the same time. While there is in the record proof by other witnesses that Isaiah said that he had sold the land to Jack, the proof is very indefinite as to what land was included. It may have been only the clearing around his house or the hollow in which the house was built. Jack claims that it was all of the Scott two hundred acre patent lying east of Fugate's creek, which would make it include quite a large body of land, but there is no evidence whatever that this large body of land was ever expressly named. About the year 1902 certain parties were buying coal land in Harlan county; they obtained options from Isaiah Creech for a large body of land, including that in controversy. They then had the land surveyed. Two of Isaiah Creech's sons, who were brothers of Jack Creech, assisted in making this survey, which included the land which Jack Creech now claims. After the land was surveyed Isaiah Creech made the purchasers a warranty deed for the land and they paid him $10.00 an acre for it. Jack Creech knew of this survey and knew of the proposed purchase but did not disclose that he had any claim to the land. His father rented from the purchasers another tract and Jack moved to it, thus vacating the land and giving the purchasers possession. The facts leave no doubt that the father made this arrangement to get Jack off the land so that he could collect the $10.00 an acre for it and that Jack moved away well understanding that his father was selling the land and getting money for it. He says that he moved from the land to the other place because it was nearer the schoolhouse and he wanted to send his children to school. But he at no time testified that he was ignorant that his father was selling the land and collecting $10.00 an acre for it. In fact his whole testimony shows he knew very well what was going on. His father lived

until 1912. Up to that time Jack Creech did nothing to bring to the notice of the purchasers that he had any claim to the land. To have asserted a claim to it in his father's lifetime would have been to get his father into trouble. In fact he took no open steps until about the time he filed his suit in 1917. From 1902 the purchasers had tenants on the land; they held to the extent of the boundaries. One of these tenants was A. C. Clemm, who in 1908 sublet the cleared land which Jack Creech had held to W. D. Hampton for grazing purposes and Hampton grazed his cattle there. After this, while Clemm was still on the land as tenant of the purchasers, on May 9, 1909, Clemm took a lease from Jack Creech for the land. But no notice of this was given to the agent of the purchasers, who had rented the land to Clemm. Jack Creech claimed that after this he had possession of the land by his tenant Clemm under a lease for ten years, for which Clemm paid nothing but was to have the use of the land for the work he did on it; but Clemm was careful to get the consent of the agent of the purchasers to all the work he did on the place, which consisted in moving a house and putting up some fences, and he did not let the purchasers know that he had any lease from Jack Creech. During all these years Jack Creech well knew, as his son expresses it, that Isaiah Creech had sold the land from under him. In 10 R. C. L., page 780, the rule is thus stated:

> "It has been held in many cases that if the owner of land knowingly stands by and permits his property to be mortgaged or sold by another to one who is, to the owner's knowledge, relying on the apparent ownership of the person executing the conveyance, such conduct, irrespective of who benefits by the transaction, will estop the owner from asserting his title against the mortgagee or grantee."

To the same effect are the following Kentucky cases: Brothers v. Porter, 45 Ky. (6 B. Mon.) 106 (1846); Ringo v. Warder, Id. 514 (1848); Davis v. Tingle, 47 Ky. (8 B. Mon.) 539 (1871); Sale v. Crutchfield, 71 Ky. (8 Bush) 636 (1876); Morris v. Shannon, 75 Ky. (12 Bush) 89; North Jellico Coal Co. v. Helton 174 Ky. 335.

The whole arrangement between Jack Creech and his father was verbal. His subsequent conduct indicates strongly that in 1902 he had not held the land long enough to claim it successfully against his father and that what

he really claimed was the hollow where he lived, including his house and cleared land. But, however this may be, the evidence is clear that he then held his peace and moved away from the land and thus put it in his father's power to sell and convey with general warranty and collect the purchase money. He not only did this, but knowing that the land was sold and in the possession of the purchasers, he held his peace until his father died, so as to give his father no inconvenience or trouble and in fact did not bring this suit until five years thereafter, when no doubt the father's estate had long since passed into the hands of the heirs. Having been silent when he should have spoken, and having actively in fact aided his father in making the sale by moving from the land, he cannot have the aid of the court of equity to quiet his title to the land against the purchasers who bought from the father for value without notice of his claim under his parol contract with his father.

It is earnestly insisted for appellee, Jack Creech, that the estoppel was not pleaded and that the well settled rule is that estoppel to be available must be pleaded; but the facts above stated are convincing evidence that Jack Creech did not own the land at the time his father sold it; for a man owning a valuable tract of land on which he resides does not ordinarily stand by and allow it to be sold by another and the purchase money to be paid to another without objection, or then move off and allow possession to be given to the purchaser.

Judgment reversed and cause remanded for a judgment in favor of appellants.