## Collins, &c. *vs* America, a woman of color.

### APPEAL FROM THE GREENUP CIRCUIT.

#### *Slaves. Comity.*

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

TRESPASS.

*Case* 129.

*September* 25.

Case stated.

THIS action of trespass was brought by America, a woman of color, to assert a right of freedom against Collins, who claimed to be her owner, and Harrison, who had her in possession under hire from Collins; and the plaintiff having obtained a verdict, which the Court refused to set aside, the defendants have appealed to this Court for the reversal of the judgment against them.

It appears that America had been, for many years, the slave of Collins, in this State; that after the death of Mrs. Collins, she had assisted greatly in nursing and rearing her infant daughter, who afterwards intermarried with one Woodrow, and resided with him at Hillsborough, in the State of Ohio, and that, in 1844, America went, by the authority of Collins, to the residence of his daughter in Ohio, and after remaining there a short time, (about two weeks or less,) returned to the house of Collins, in company, as it would seem, with Mrs.

COLLINS, &c,
vs
AMERICA.

Woodrow, his daughter; upon the termination of whose visit to her father, America went back with her to Hillsborough, and, in a few days, again returned to the res_idence of Collins, as his slave, and continued subject to his control as such, until December, 1846, when this suit was brought.

Proof.

On her first journey to Ohio, America took with her one or more written notes, or passes, which appear to have been placed in the possession of her attorney in this suit, but of which one only was produced on the trial. So much of that one as tends to elucidate the nature or purpose of the journey, which it was intended to facilitate, is in the following words:

GREENUPSBURG, June 26th, 1844.

*Mr. C. A. Garrett:*

My black girl America comes to Cincinnati, on her way to Hillsborough, Ohio, to stay with my daughter, who is very unwell: will you be good enough to pro-cure a passage for her in the stage to Hillsborough, &c.

It was proved by a witness for the defendants that, immediately before the plaintiff's departure for Ohio, she had stated at his house, and in his presence, that she was going on a visit to her young mistress, (the daughter of Collins,) and expected soon to return. It was also proved that Mrs. Woodrow was in bad health at the time; and it might be inferred that, whether the visit was allowed at the request of America, or was made by the direction of her master without such request, it had particular reference to Mrs. Woodrow's condition, and that its duration, though not, perhaps, definitely prescribed, was expected to be short. And, doubtless, it was intended and expected that America would, while with Mrs. Woodrow, perform such offices or services as she was capable of, and as Mrs. Woodrow's situation might require. One witness for the plaintiff proves that he saw her once eat a meal's victuals, and saw her once or twice sewing in Mrs. Woodrow's room, and twice in the kitchen at work. And Woodrow, the son-in-law, in a deposition taken without cross examination, says that Collins sent his slave, America, to Ohio, to wait on his daughter; that by his

express directions, she was employed as his slave, for about two weeks, in doing work in and about the house and kitchen of the witness; that she was sent, not on a visit, but to work for and wait upon his wife, who was then in bad health; and that she came on another occasion to Ohio, to wait on his wife; "which second term of service," he says, took place after his wife made a visit to her father, when America returned with her, and again, by permission and direction of Collins, remained in deponent's family, and labored, as before, for one or two weeks.

If the particular expressions used by this witness in characterizing the directions of Collins, the purpose of America's journeys to Ohio, and the nature of her employments or services while there, were to be considered as materially affecting the case, the fact that the witness, throughout his deposition, displays an evident bias in favor of the plaintiff's cause; that he makes no reference to his means of knowledge; that he had not been in Kentucky for some years prior to the period spoken of, nor then; and that Collins was not in Ohio with America, might leave these statements fairly open to the inference, that they were either founded upon the conduct or statements of America, or on other hearsay, or that they were mere inferences from the written pass or passes which he says he sent to Greenupsburg, but of which one only was produced. And although the exception that the deposition proved the contents of a writing, did not meet the case, and was properly overruled, because the deposition did not detail the contents or substance of any writing, nor disclose the grounds on which its assertions were based, nor those on which the inferences above stated arise; still the objection might have been made available in the form of a hypothetical instruction, submitting to the jury the question as to the grounds of the deponent's knowledge or assertions, and instructing them that, so far as they were derived from hearsay, or from a writing not accounted for, or from one which was produced and placed before them, they were of no value.

But whatever coloring the deposition may be supposed to have given to the facts, it proves at last nothing more than what might otherwise be inferred: that Collins did not send or permit America to go to Ohio as a free person, so to be received and remain, but that she was to go, and stay, and return as his slave. And this having been actually done, it is certain that there was no intended renunciation of dominion on his part, and no disclaimer or rejection of it on hers, either in Ohio or in Kentucky, until some time after her return, when she asserted a right to freedom, as being founded on this temporary sojourn in Ohio. And the real question is, whether because the fundamental law of Ohio prohibits, or does not allow slavery or involuntary servitude, America became absolutely free by or during her sojourn in that State, so that she is no longer a slave in Kentucky. She made no appeal to this law of Ohio, while within the sphere of its territorial operation, claimed no right under it, made no assertion of freedom, but went, and stayed; and returned by, and according to, the will of her Kentucky owner, in subjection to him, and as his slave.

If the simple declaration in the ordinance of 1787, or in the constitution of Ohio, that "there shall be neither slavery nor involuntary servitude" in that State, should, if standing unqualified, be deemed equivalent to the declaration, that every person within that State is, and shall be free, and should be regarded as applying by force of its own terms, to every person within the State, and as imparting to every such person the absolute right of freedom, then, if there were no other law applicable to the case, but the simple declaration as above quoted, we do not perceive how it would be possible to avoid the conclusion that, under whatever circumstances a slave from another State might, at any time, be within the limits of Ohio, for whatever purpose, or in whatever manner he might have come or been brought there, whatever might be his conduct or occupation while there, and however short might be his sojourn in that State, the mere fact that he was once, though but for an hour or a moment, upon its soil would free him

COLLINS, &c.
vs
AMERICA.

absolutely and forever, from the dominion of his owner, unless an individual, absolutely free, may become a slave by coming, or being brought back into a State, in which he had once been a slave. It would, of course, be immaterial whether he had, by his master's consent, been taken or sent into the State as his home, or for a momentary purpose only, or whether he had, without his master's consent, escaped from the State in which he was lawfully held as a slave, into the State of Ohio, where slavery is not allowed.

The constitution of the United States, (*Art. IV. sec. 2, clause 3*,) applying certainly to the case of the fugitive slave, exempts that case from the operation of the prohibition or declaration against the existence of slavery in Ohio, even if it be otherwise entitled to the broad construction and effect above supposed. But in Canada, where the constitution providing this exemption has no force, the fugitive slave is regarded and protected by the law as a freeman, in consequence of the prohibition or disallowance of slavery in that country; and yet, although this principle in the law of Canada, whether written or unwritten, is, until repealed, just as authoritative there, as the similar principle in the ordinance of 1787, or in the constitution of Ohio is in that State, it never has been supposed, and cannot be admitted, that the fugitive slave who, after escaping from Kentucky into Canada, and there enjoying such freedom as the laws confer, returns, or is brought back to Kentucky, would, on the ground of that freedom, and of the laws of Canada, be pronounced free by the tribunals of this State. Although by his escape into Canada, he would have renounced the dominion of his owner, and claimed and actually enjoyed the condition of freedom which her laws declare, he would still be a slave here, not because a free man can be made a slave by being brought into this State, but because here the law of this State must prevail, and not the law of Canada, coming in conflict with its policy and interest and the rights of its citizens, and the law of this State, in opposition to the law of Canada, determines that he never was lawfully or rightfully free.

A slave escaping from Kentucky to Canada and being brought back to Ky., acquires no right to freedom by having been in Canada.—*Argu.*

It has not been shown in this case what construction or effect the Courts of Ohio have given to the prohibitory declaration now in question. Nor, indeed, has the constitution or any law of that State, upon the subject of slaves or slavery, been produced or proved. The argument in favor of America's freedom, is based upon the prohibition in the ordinance of 1787, of which we must have knowledge. And we may assume that the prohibitory principle declared in the ordinance, has been substantially incorporated into the constitution of Ohio, and the other States formed out of the territory for the government of which the ordinance was made. We may suppose, too, that by the practical construction and effect given to the principle in Ohio, it entitles the slave who is actually within the State, and without regard to the manner or purpose of his coming there, (unless he be a fugitive from another State, by the laws of which he is held in slavery,) to claim the rights of a freeman before the tribunals of that State, and to assert the remedies common to others for repelling any attempted coercion or exercise of dominion, and for relieving himself from any outward restraint.

The present case does not present the question whether a judgment rendered in Ohio, in accordance with the construction above supposed, and between parties fairly within the jurisdiction of the Court there, would be binding in this State between the same parties, or their privies. But conceding that a Court in Ohio, having the right of construing or effectuating her laws in a case properly before it would render such a judgment; and conceding, too, without deciding that, looking alone to the fundamental law of Ohio, the Courts of that State might be authorized or bound to disregard the right of property secured to the citizen of Kentucky by our laws, and to accord to his slave, while within the jurisdiction of Ohio, unless coming there as a fugitive, the rights and remedies of a freeman; still, the question is, whether because the Courts of Ohio, acting under the laws of that State, would or must, in a case properly before them, disregard the conflicting laws of Kentucky, and deny a right of property estab-

lished by those laws, the Courts of Kentucky are also bound, or even authorized, in a case where there has been no adjudication by the Courts of Ohio, no appeal to the laws of that State, and no claim of any benefit under them, while within their local operation, to disregard the laws of our own State, and to give effect here to the laws of Ohio, sought to be enforced for the first time in the particular case, by appeal to the remedies and the tribunals established by our laws.

The answer to this question must be, that the appeal. being to the tribunals of Kentucky is, in effect, an appeal to the laws of Kentucky, and must be decided by them; that the laws of no State have, by their own force, any operation beyond the territorial or jurisdictional limits of that State; that it pertains to the sovereignty of every independent State, to determine for itself, and according to its own interests and policy, in what cases and to what extent the foreign law shall be adopted as a part of its own, and operate upon persons and things within its territory. And that it is an essential principle of the law of comity which, in the absence of any municipal law upon the subject regulates, upon grounds of reason and practice, the admissibility of the foreign law, that no State is bound to admit, or give effect to, a foreign law which violates its own rights or policy, and is destructive of the rights and interests of its citizens: *Story's Conflict of Laws, sec.* 29, 34, 35, 36, 37, *pages* 39 *to* 47, (*third Edition.*)

If the laws and Courts of Ohio may determine the condition of the slave while in that State, they cannot, by their own force or power, determine what shall be his condition when he has gone beyond their territorial jurisdiction. And when he returns to the State in which he had been held as a slave, it is for the law of that State to determine whether, under the actual circumstances of the case, he is entitled to the benefit of the foreign law, and to the condition which he might have claimed while within its jurisdiction. In the absence of legislation upon the subject, this question must be decided by the tribunal to which the appeal is made, and which is bound to regard, not merely the foreign

law, but also the laws and policy of its own State, and to decide between them, according to the general principles of comity and justice applicable to the case. Whatever, then, might have been the effect of a judgment rendered in Ohio establishing America's freedom under the laws of that State, and even if those laws, if appealed to, might have authorized or required such a judgment, they have no operation here, except so far as our law may give them effect: *Story's Conflict of Laws, ubi supra, and sec.* 37. And our law upon that question is, as we think, settled by previous adjudications of this Court.

In the case of *Rankin* vs. *Lydia*, (2 *Mar.* 476, &c.) the question is expressly stated and discussed, as to the effect of the ordinance of 1787 upon the condition of a slave going temporarily within the territory by which that ordinance was governed, and the Court adopted, and forcibly maintained the conclusion that, although the slave might go with or by the consent of his owner, his condition would not be permanently affected by the ordinance, but he would be still a slave in Kentucky, notwithstanding his temporary sojourn in, or transit through, a territory in which slavery was prohibited. And this opinion was supported, first, upon the principle that, by the law of nations, the property of an individual does not cease to belong to him, on account of his being in a foreign country, but is still a part of the totality of the wealth of his nation, and that the property of the sojourner is thus preserved by the law; an argument which gives to our own, and not to the foreign law, the decision of the question of property in this particular thing. And, secondly, upon the ground that the ordinance should be construed in conformity with these principles, as not applying to sojourners, but merely to inhabitants and settlers, to whom it applied in terms; and who, it was admitted, would, by becoming such, be completely subject to the operation of this principle of the ordinance, and lose their right of property in slaves taken with them, or brought to them, for residence within the territory.

A slave who has been in Ohio and returned to the custody of the master in Ky. and appeals to the laws of Ky. for freedom, must have that claim decided by the laws of Ky. Comity does not require one State to violate its own laws or policy to enforce the laws of another: *Rankin* vs. *Lydia*, (2 *Marsh.* 476, cited and approved.)

COLLINS, &c.
vs
AMERICA.

This distinction between the effect of this foreign law upon sojourners, with their property, and upon inhabitants or residents in the foreign territory, has never been disregarded by the Court, but has always been recognized, when involved in the case before it. In the case of *Bush's Representatives* vs *White, &c.* (3 *Monroe,* 104,) the slave was decided to be free, because she went to Ohio by the consent of her owner, *to reside there.* In the case of *Stanley* vs *Earl*, (5 *Littell*, 285,) the Court says *arguendo:* "But if the master voluntarily removes the slave to a non-slaveholding State, or if the slave escapes to a foreign country which does not tolerate slavery, the master's right, so long as the slave remains there, is gone, because he has no remedy to enforce or protect it."

A slave in Ky. sent or permitted to go to Ohio, for a temporary purpose, where slavery is not tolerated, does not thereby acquire a right to assert freedom in Ky.: *G ahcm* vs *Strader*, (5 *B. Mon.* 179.)

The case of *Graham* vs *Strader, &c.* (5 *B. Monroe,* 179, &c.) also decides upon the provision of the ordinance assumed to have been incorporated in the constitution of Ohio, that a slave going temporarily into Ohio, with or by the consent of his master, and returning to Kentucky, is not free by operation of the Ohio law, and maintains the same distinction that was taken in the case of *Rankin* vs *Lydia.* We refer to the opinion in the case of *Graham* vs *Strader*, as applicable to the question in the present case, and as dispensing with the necessity of repeating the views there expressed.

But a removal for residence, to a free State, gives a right to freedom: *Tom Davis* vs *Tingle,* (8 B. Mon. 546.)

In the only remaining case, that of *Tom Davis* vs *Tingle*, (8 *B. Monroe,* 546-7,) the distinction between the effect of a removal to Ohio for residence, and a mere temporary sojourn there, as affecting the question of permanent freedom, by operation of the foreign law, is not controverted, but is rather confirmed.

Nor do we consider the numerous cases from other Courts, to which we have been referred, unless it be some of those from the Supreme Court of Louisiana, as overruling or disregarding this distinction. With the exception mentioned, none of them imply that the mere presence of the slave, by consent of the master, within the State which prohibits slavery, imparts to him absolute and permanent freedom; but they go upon the ground that, under the particular circumstances of each

case, as to the effect of which the forum appealed to decides in all the cases, the law of the non-slaveholding State operated to impart freedom to the slave, and that he continued free afterwards. Whether we should have concurred with the decision in each case, is not material. We do not regard the decisions as affecting the principle adopted by this Court, that the slave is not to be considered as free here, because he has, by the consent of his master, been temporarily within the territory of a State, whose laws prohibit slavery, and especially when, as in this case, he goes and returns in acknowledgment of his subjection, and of the right of his master. The owner, it is true, by consenting to such an entry into the foreign State, submits to a temporary suspension of his legal right, or rather of the legal means of coercion, and, perhaps, subjects himself to a permanent loss of his property, by reason of a permanent loss of the means of coercion. But while the thing itself continues in his possession, as the slave does in accompanying him, or in going and returning by his authority, and under his will, these means are not required, and the mere temporary suspension of the right to use them, because the law of the place does not furnish them, cannot affect the right where the laws do furnish such means. Nor are we to be understood as deciding, that the want of a remedy for coercion, even in case of a denial of the master's right in the foreign State, should be regarded, when he and the slave are afterwards in their own State, as extinguishing the right. We are inclined to the opinion, that when the master and slave, after going into the foreign State for a temporary purpose, are found here in their former relation, they should be considered as having been under the laws of this State during the entire period; at any rate, unless there has been some authoritative application of the foreign law to their rights and condition while they were within its jurisdiction, as to the effect of which we need not enquire. These remarks, and the reasoning of this opinion, are made without reference to a case in which the foreign law may directly prohibit the introduction of a slave, or the retaining of him

within the State for a certain period, and declare the consequence of either of these acts, and we decide no question as to the effect of such a law.

The opinions of the Circuit Court, in giving and refusing instructions, imply that, if a slave, by the consent of his master, goes into the State of Ohio for the performance of any service or office, and, according to his direction, performs the office or duty and returns, in no matter how short a period, he has become free. We are of opinion that, in the absence of special legislation on the subject, the period of the slave's remaining in Ohio, is only important as it may bear upon the question, whether the slave was there for a merely temporary purpose, or for such purpose, or with such privilege as to the period of his stay, as would make him, in substance, an inhabitant, and thus show that he was essentially identified with the population of the State for whom its constitution was intended. If America was sent to Ohio as her home, or with the privilege, by consent of her master, of living there, or of making it her home, or for the purpose of being free, or under any circumstances which should, in reason and justice, identify her with the institutions of Ohio, she became free by operation of the fundamental law of that State, as soon as she entered its territory. And we perceive no principle of policy, or of public interest or of justice, which would require the maintainance of the owner's right in this State, upon her subsequent return, under the impulse of her own free volition. But the principle of this opinion, and of the case referred to in this Court is, that in consenting to the visit or sojourn of his slave in Ohio, intended, in good faith, to be temporary and transient, the owner is not to be understood as renouncing, according to our laws, either his right of property, or the benefit of the laws which secure it; and that, upon the return of the slave, in accordance with the terms of the consent, he cannot be regarded as free, merely because he had had the opportunity of violating those terms in a foreign State, but will stand under our law as if he had never been beyond its direct operation. This principle we consider as not only reasonable in it-

COLLINS, &c.
rs
AMERIC.'.

self, and consistent with comity and the law of nations, but as necessary for maintaining the right of property in slaves established by our laws, and as especially essential to the safety of that right, as held by a large portion of our population, bordering for hundreds of miles upon the Ohio river, which separates them from States whose laws deny the existence of any such right. If the opposite principle should prevail, the slave owner upon the Ohio would be absolutely deprived of his right, by sending his slave across the river, and even by permitting him to go across on the most trivial errand, or on the most pressing emergency—though it were to rescue an individual from murder or robbery, or to extinguish the flames which were consuming his neighbor's house, or to bring a cord of wood or a bucket of water. The instruction, as given, embraces and tends to establesh these consequences, and, if sanctioned by this Court, the slave upon the border would only have to prove that, on some occasion, he had been across the river into the neighboring State, by the consent of his owner, which, no doubt, could, in numerous instances, be easily done. We feel bound, therefore, to decide, that the instruction, as given, is erroneous, and that the law of the case is, that if America was sent to Ohio for a merely temporary purpose, (as that of aiding her master's daughter in her illness, or of visiting or staying with her on such occasion,) and was to return upon the accomplishment of the object, which was expected to be in a few days or a few weeks, and, if, under this authority, she did go and accomplish the object intended, and returned, as expected, she can claim no benefit from her absence, nor any privilege under the law of Ohio, and is not free, but continues to be a slave.

Wherefore, the judgment is reversed, and the cause remanded for a new trial.

*Apperson and J. W. Davis* for appellants; *J. & W. Harlan and T. Y. Payne* for appellee.