Brinkerhorr, J.,
concurring. For the reason that the principles involved, in this case are of great moment, and are now regarded with general and peculiar interest, I will so far depart from the ordinary usages of the court as briefly to state separately the grounds on which I place my concurrence in the judgment we are about to render.
The case made in the pleadings and proof is this:
Henry Poindexter, held as a slave in Kentucky, executed, together with his co-defendants as sureties, to the plaintiff, Anderson, who claimed a legal right to hold him, the promissory note sued «on in the common pleas of Clermont county, in this state; in consideration of which note, and others, the plaintiff agreed to and did release Poindexter from the slavery in which he was held, and *633, 634 promising to give him his “ free papers,” or deed of emancipation, so soon as this note, and other notes given at the same time and for the same consideration, should be fully paid. Before the giving ■of these notes, Poindexter, with the *knowledge and consent, [633 and sometimes by the direction of Anderson, had in several instances come into the State of Ohio, and after remaining a short time in doing the errands on which he was sent, had voluntarily, but probably in ignorance of his rights, returned into Kentucky .and resumed his residence with Anderson. After the giving of the notes, Poiiidexter labored awhile for Anderson for wages, and then took up his residence in Ohio.
The case in the common pleas was submitted to the court for trial, and a judgment was rendered for the defendants. The jDlaintiff then appealed to the district court, which also gave judgment for the defendants. And to reverse that judgment this petition in error is prosecuted.
Two questions properly arise in this case:
1. It is contended for the plaintiff, that the case, by the comity ■of nations and states, is to be determined by the lex loci contractile, and that by the laws of Kentucky, where the note sued on was executed, it was a valid note.
Now, granting for the sake of argument — what I do not admit, but what on the contrary I deny — that the lex loci is to decide the validity of this note, how then stands the case?
Under the laws of Kentucky a slave is incapable of contracting. He can hold no property; he can acquire no rights; his natural domestic relations even are ignored. He has not a right to the child he has begotten, to nurture it, nor to the wife he has chosen and cherished, to protect her. According to the theory of those laws, the slave belongs to the master as property, and descends to his heirs as real estate. No contract can increase the liabilities of the ■one or the power of the other. A contract of emancipation imparts to the slave no legal right, and imposes on the master no legal obli.gation. It is simply nugatory and void. The promise of the slave to pay money in consideration of such a contract is null. Being null'when *mad.e, no subsequent act of emancipation on the [634 part of the master can impart to it any new force. It thus results logically from the theory of the slave code of Kentucky, that the note'which the plaintiff now seeks to enforce here was invalid there. And moreover, by chapter 93, article 9, of the revised statutes of *635 that state', and which seem to be still in force, emancipation, except, by deed or last will’ and testament, executed in conformity to its-provisions, is prohibited; so that, under the legislation of Kentucky, Poindexter has never yet been legally emancipated, and thereby rendered competent to contract.
2. But were it otherwise, could this note be enforced by judicial procedure in Ohio? By the laws of nature, all persons are free; no human being is born, or can be born, a slave. The laws, by a stretch of courtesy, so called, of particular countries or states, may subject certain persons to be held and treated as the mere transferable instruments of other persons; and this subjection, which constitutes slavery, originating in force and fraud, and uj>held by local laws which adopt and sanction the original wrong, may attach immediately after birth, as the effect of positive law in derogation of natural right; but still it remains true, that the absolute and equal freedom of all persons at birth is a fundamental principle'of American institutions, .proclaimed with independence, and incapable of abrogation. This principle was, by the ordinance of 1787, impressed' on the soil of Ohio before there was an organized community within, her limits. It is fundamental in her organization- — -always embodied in her constitution; and her laws, her policy, and the convictions,, the morals, and the religion of her people, are instinct with its spirit-.
The moment any person comes within the territorial limits of Ohio, his personal rights are ascertained and determined by the constitution and laws of Ohio.
*There is no exception to this rule, save in the case of a. person who, being held to service in another state, escapes into this. In such a case, the constitution of the United States declares that the fugitive “shall be delivered up on claim of the-party to whom such service or labor may be due.”
There is nothing in this article of compact which gives any sanction to that slavery, the essential elemon.ts of which is asserted property in men — nothing inconsistent with the purpose of the framers of that constitution, clearly manifested in their debates, as reported by Mr. Madison, to avoid all recognition of “the idea that there may be property in men.” 3 Madison Papers, 1429-1430.
It establishes no rule which does not apply equally to all “ persons held in service.” It takes up and deals with the broad and general relation of “master and servant,” but has.nothing whateveito do with the relation of owner and property.
*636 When, therefore, a person held as a slave in another state escapes into this state, he ceases to he, in any proper sense of the word, a .slave. And the courts of Ohio, I apprehend, would decline to recognize or enforce any contract of purchase or sale, wherever made, •of which he might be the subject while thus-within our limits. The relation of subjection as property, created by the local law of the state he has left, can not follow him beyond the limits of the sovereignty which established it. In Ohio, he is a man; liable, it may be, to be delivered up on due claim and proof, but yet a man, “ a person held to service,” and, in every other respect than this, a freeman. When once so delivered up, and taken back to the state from whence he escaped, the relation of slave may re-attach under the local- law. Until then, subject only to this liability, he remains free.
In the case now before this court, there was no escape from Kentucky into Ohio. Poindexter came into Ohio, on ^several [636 occasions with the consent or by the order of the plaintiff. So coming, he was beyond the reach of the local law that enslaved him, and subject to no claim as a fugitive servant. So coming, he became entitled to the full benefit of the express prohibition of slavery by our state constitution. To all intents and purposes whatsoever, he was free. His condition or status was that of a freeman. His master, by consenting to his coming, must be hold to have consented to his freedom, which, whether he consented or not, was established by law. And being thus free, wherever he might go or be taken, he could not again be enslaved by any law which this -court can recognize as valid.
And this doctrine has been frequently held even in states where enforced property in men, with all its repulsive features and odious attributes, is sanctioned and upheld by local law. Marie Louise v. Marat, 9 La. 475; Smith v. Smith, 13 Ib. 444.
If a person held as a slave can be brought or sent into Ohio for one hour, and still retain his status as a slave, then the same thing •can be done for a day, a week, a month, a year, a lifetime; and thus this institution, the shame of our country and the opprobrium of Christendom-, be virtually established on a soil so early, so often, and so solemnly devoted to absolute freedom.
From the declaration of independence until very recently, it was never questioned that, in the United States, a person once legally free is always free. The doctrine has been regarded as a part of American common law. Courts have differed as to facts which *637, 638 constitute a title to freedom, but have, almost with one mind, concurred in the doctrine that no man once free can be again enslaved1 except for crime. In my judgment — and such 1 understand to be-the judgment also of four of the five members of this court — Poin637] dexter, having come into a free state otherwise than *by escape, was free; and-having thus become free, could not again be reduced to slavery. And this opinion governs the decision of a majority of the court; because, if free, the note given in consideration of emancipation, was without consideration, and therefore void. And the obligation of the sureties is an incident to, and is limited by, the obligation of their principal.
But it is said that the note was at least given in consideration of a compromise and release of a doubtful claim, and therefore is valid. Not so; the promise was made by Poindexter, while under duress, and wrongful duress, in consideration of release from that usurped dominion, and therefore imposes no valid obligation either in morals, or in law. 1 Parsons on Contracts, 319; Mays v. Cincinnati, 1 Ohio St. 268.
We-are awai’e that in Kentucky it has been decided that a person-held as a slave in that state, who may have been taken for a temporary purpose into a free state, and brought, or coming back again, is not thereby enfranchised, but is remanded to the condition in which he was before held ; and it is urged that .the principle of international and inter-state comity requires us to recognize and enforce this rule. The clear and sufficient answer to this claim is, that comity is not a matter to be demanded as a right, else ft would cease to-be comity. Like courtesy among individuals, how far the principle of state comity shall bo carried in any case or class of cases, is-at the discretion of the state called on for its' exercise. And no-state of the civilized world has ever felt itself bound to carry the doctrine of comity to the extent of subverting its own established policy.
But it is said it is no part of the policy of Ohio to discourage emancipation in Kentucky. This is true ; and it is also true, that it is no part of the policy of Ohio to encourage emancipation in 638] Kentucky. Ohio has nothing to do *with the subject of emancipation in Kentucky. But she has something to do with the status of persons coming within her own jurisdiction, and it is properly part of her policy to see to it that a violation of the rights *639 growing out of that status shall not, in her courts, be recognized as a valid foundation of a legal obligation.
The enslavement, by local authority, of a man once free, presents the monstrosity of a legalized wrong; it is iniquity intensified and hardened into law; and when the subject is legitimately before us, it is due t.o that principle of righteousness which is the soul of all law worthy of the name, and it becomes us, as the administrators of such law, to protest against, condemn, and, as far as may be, consistently with constitutional obligation, to nullify it because it is wrong, rather than to lend it an indirect sanction through a morbid exaggeration of the spirit of courtesy.
The policy of Kentucky is to uphold the claims of masters. Her courts, upholding this policy, refuse to recognize any obligation, of comity or otherwise, to enforce the Ohio rule of freedom. Collins v. America, 9 B. Mon. 572.
The fundamental, organic, and unremitted policy of Ohio is, to maintain the rights of men; and her tribunals, giving just effect to this policy, muso not permit themselves to be moved, by the plea of comity, to turn aside from the plain path it prescribes, to the support of the Kentucky rule of slavery. This policy of Ohio is hers by virtue of her own sovereign choice. She will, I trust, never permit it to be called in question. If she does, she will doubtless find suitable organs for the utterance of her altered will; but, as an humble member of this court, I can never consent to become the medium of its surrender.