Chief Justice Robertson
delivered the Opinion of the Court.
Archer, a man of color, having obtained a verdict and judgment for damages, in an action of assault and bat-tery brought by him against Dunlap and Collins, for trying his right to freedom — this writ of error is prosecuted for reversing the judgment.
The only proof on the trial being, on the one side, that, Archer is of servile complexion, and had been held and claimed as a slave; and on the other side, that, more than seven years prior to the commencement of this suit, one James McDonald, now of the State of Tennessee, having sold him to one Tidence Lane (at what place the testimony does not positively state,) the latter deposited with the former (viz. McDonald,) simultaneously with the sale, a “&ond”, “binding” himself “to “ give the said Archer his freedom, at the expiration of “ seven years, upon condition that (he) would serve him “ faithfully for seven years from that time' that the “bond” was lost; and that Archer had served as a slave in Kentucky for the last four years precéding the institution of the suit — the Circuit Judge, upon that testimony, refused to instruct the jury that, “if, from “ the evidence, they believed that the plaintiff was a *31 “ slave at the time Lane agreed to set him free, that '« agreement, being executory, did not, of itself, so ope- « rate as to emancipate the plaintiff at the expiration of “ seven years from the time therein stipulated;” but instructed them that, “if,"from the evidence, they belie v- « ed that the parties to the contract intended that the « plaintiff should be set free at the expiration of seven “ years, said contract did, of itself, after the expiration “ of that time, emancipate the the plaintiff.”
The slave having resided in this State , and no proof that he was ever out of it, nor that the writing under which he claims his free dom was made elsewhere, it is presumed that it was made here, (tho’ the former master resides in another State.— But if it were a foreign contract, as it is not intrin sicahy void or vi cious, it must be deemed valid, in the absence of proof that it was in contravention of the local law ofthe place where it was made.
If the vendor and purchaser of a slave agree between themselves that he shall be set free at afuture day — the slave no party to the contract — tho’ a court of chancery might compel a specific executio n of it for the benefit of the slave, the contract would not of itself emancipate him, so that he could sue upon it.
Whether the Circuit Court erred in refusing the one, or in giving the other instruction, is the only question to be 'determined by the Court.
Archer having resided as a slave in this State, and there being no proof that he was ever out of it, the legal presumption, in the absence of satisfactory evidence to the contrary, is that, the contract on which he relies was made in Kentucky. But were it, in fact, made elsewhere, still, without proof of a positive local law to the contrary, the judicial presumption would be that it was valid, whether Archer or McDonald was the second party to it; because, according to universal law, and to reason and analogy, and the principles of common law, such a contract between even a master and his slave, cannot be either intrinsically void or vicious: and therefore, as we cannot, without proof, take judicial cognizance of the lex loci of a foreign State, it would be our duty to presume in favor of the legal validity and effectiveness of the contract.
For the reason first suggested, however, we shall consider the contract as having been made in this State..
If McDonald, and not Archer, was a party to the contract, though, as decided by this Court in Thompson vs. Wilmot, (1 Bibb, 422,) a court of equity might compel a specific execution of it, for Archer’s benefit, yet, nevertheless, as it could not be deemed an executed charter of emancipation, it would be insufficient for maintaining this action, which can be sustained only on the ground that Archer is, in judgment of law, a freeman.
The fact that a lost paper, by which a slave claims to he e mancipater], was deposited with his former master, for safe keeping, rather implies that it was a declara tion of emancipa tion — not a contract with the for mer master.
As the Constitution of Kentucky enjoins on the Ie gislature to pro vide a mode in which slaves may be emancipated, it has been under stood that it could only he done in the modes prescribed by law. Owners of slaves are authorized to emancipate them by last will, or any instrument of writing; and it has been often held that a condi tional or prospec tive emancipation may be effectual.
But the fact that the memorial of the contract was deposited with McDonald for safe-keeping, rather implies that he was not a party to it; and therefore, the jury might have inferred that it was either given to Archer, or was not a covenant with McDonald, but a mere declaration in writing of Archer’s conditional title to freedom. And thus considered, the question is whether it be entitled to any legal effect, and if any, what?
As the Constitution of Kentucky enjoins on the Legislature the duty of prescribing some mode for the emancipation of slaves by their owners, it has been construed as implying an interdiction of emancipation in any other mode than that which shall have been so prescribed by legislative enactment.
A statute of 1800 authorizes owners of slaves in this State to emancipate them by last will or “any instrument of writingAnd this Court has frequently decided that, according to the legal effect of the enactment, an emancipation, by will, or by any writing, may be effectual and perfect, although it be prospective or conditional. And, of course, had the writing in this case declared expressly that Archer should be a free man at the end of seven years, if during that period he should faithfully serve Lane, there could be no doubt that, after such service, he would, at the expiration of the seven years, have been ipso facto free. But, as the writing does not expressly declare that Archer should, at the prescribed time and on the prescribed condition, be free, the question to be decided is whether it should be construed as meaning only that, at that time, and on that condition, Lane would give him a deed or other document of instantaneous and unconditional manumission, or as intending, (by the stipulation that he would ‘•‘give him his freedom”) that he would then cease to claim ownership over him, and would let him go at large as a freeman; or, in other words, liberate or manumit him, that is, send away from the master’s hand, or take his hands off, or let go his hold upon him, which is all that is literally implied by the word manumit, liberate or enfranchise. And we are inclined to give the latter interpretation to the writing as described in the record: (1) because to “give Archer *33 his freedom”, does not literally import more than that he should be, in fact, as well as in law, a free man; (2) because the writing, if available, certainly entitled Archer to freedom, on .performing the stipulated' condition, and does not provide for or seem to contemplate any other written memorial of that right; and no other writing, after the performance of the condition, could have been more necessary than it would have been had the writing first executed declared that, on performing the prescribed service, Archer should be free. 'The fact of performance or of unconditional freedom at the end of seven years, would not appear, on the face of the latter kind of writing, more than on that of the former;' (3) because, if there be such an available right to freedom as might be enforced in a court of equity, the decree of such a tribunal would be, not that Lane or his alienee should execute a deed or other document of emancipation, but only that Archer is and shall be a free man; and as such á decree could be rendered only on the ground that he has, in law, a title to be free, a jury, on the same ground, might, in a common law action involving that question of title only, render the same decision — ■ if the writing was not a covenant with McDonald, but a mere declaration of Archer’s conditional right to freedom; . and therefore, the circuity and delay of a suit in chancery would seem to be altogether unnecessary; (4) because, if the writing be not available at law, as a conditional emancipation, it might possibly be void as a mere promise by a master to his slave, to emancipate him by an instrument of writing; or might not be available under the constitution, as the. statute does not provide ' for an executory agreement to emancipate by a future will or instrument of writing, but prescribes only a will or other written document of emancipation; an'd therefore, if the true constructive character and effect of the written memorial be, as we feel that it is, doubtful, it is, as we think, our duty to construe it as having, and being intended to have, the effect of a prospective and conditional emancipation by writing — ut res majis mleat quam pereat; (5) as there may be • a prospective conditional emancipation by a will or instrument of writing, we can *34 perceive no good reason why, in any case, more than one memorial of a right to freedom ' should be required by tpe jaWj or contemplated by the owners of slaves who determine to emancipate them; nor, especially, why a writing showing that a slave will, at a designated time and on a prescribed contingency, be entitled to freedom, 'should not be, in every sense and in every forum, as effectual as any document of prospective or conditional emancipation could be deemed or made to be.
The constitution and statute of Kentucky respecting .the emancipation of slaves, look only to the will and intention of the owners of slaves; and therefore, in prescribing, as the statute of 1800 does, that a master may 'emancipate his slaves by any instrument of writing, the 'Legislature should, as we think, be understood as intending that any writing manifesting a master’s will that his slave shall be free at a future day and on a prescribed -condition, should be a sufficient document of prospective and conditional emancipation. The only object in requiring a writing was to evince deliberation, and prevent frauds and perjuries. The intention to emancipate, and the terms or conditions of emancipation, must be manifested by writing. This, in our judgment, is all that the statute requires for effectual emancipation.
And in this construction, we are fortified by the concurrent opinion of the Court of Appeals of New York, given in the case of Keteltas vs. Fleet (7 Johnson’s Reports, 324,) on a statute of that State coincident in substance and almost in letter with that of 1800 of Kentucky.
There, the Court said that a writing, delivered by a master to his slave, or to another as his depository, and declaring that the master “did promise and agree to give his boy Tom free in eight years” — “was a conditional emancipation.”
The case of Thompson vs. Wilmot, supra, shows only that an agreement between a master and a stranger to his slave cannot be per se an emancipation of the slave, but that, if it be founded on an available consideration between the parties to it, a Court of equity may, independently of any statute, decree a'specific execution of it, as well as of any other valid executory agreement.
In Beal vs. Joe (Hardin, 51,) the contract seems to *35 have been of the same kind; and moreover, the then. Judges of this Court thought, erroneously, that a sealed writing of emancipation was indispensable.
A certain lost wri> ting stipulated that a slave sho’d Re free, if he served faithfully for 7 years: whether the paper was de livered to him, (and' so a conditional emancipation,) and whether he performed the service, were questions for the jury. Instructions that he-was absolutely emancipated by the writing, were.erroneous..
Judge Ewing’s Opinion, that the writing {supra) was executory , not of itself an emancipation.
Doubtless the statute of 1800 should be Understood as requiring that the writing which it prescribes shall have.been delivered by the master to the slave or to his agent. But not only is no other consideration required than that natural right or benevolence sanctioned by the law, but, so far as emancipation is concerned, the constitution and the statute make slaves competent to-receive and enjoy the benefit of written documents of their title to liberty, granted by their masters according to the laws of the land.
We are therefore of the opinion that the writing, as proved, in this case, might have been understood by the Court and jury, as making Archer a free man at the expiration of seven years from its date, if, i'n the mean time, he fulfilled the stipulated condition of faithful service.
But there'was no direct-or conclusive proof, either that the writing proved by McDonald, was not a covenant executed to himself as a party thereto, or that Archer had served faithfully for seven years succeeding, the date and delivery of the writing. And therefore, though the jury might, in the absence of any fact to the contrary, have inferred that the writing was not a covenant with McDonald, and that Archer had served faithfully for the seven years; yet, nevertheless, they were instructed to find a verdict without any regard to: either of those facts; and therefore, the instruction must, in our judgment, be deemed erroneous..
Wherefore, the'judgment of the Circuit Court must be reversed, and the cause remanded for a new trial..
Judge Ewing’s
Opinion. Though I do not absolutely dissent from the opinion just read, I certainly entertain great doubts, and incline to the opinion, strongly, that the instrument as proved, was an executory contract, binding Lane to give a writing of emancipation, at the expiration of the time, in case of faithful service; *36 and cannot be construed an executed writing, of emancipation, within the provisions of our statute. That the “obligation to give him his freedom,” is a covenant to do so> the form prescribed by the statute, namely, by the execution of the proper writing, and not barely an agreement, that the slave shall be free, or go at large, at the expiration of the time, upon the terms and conditions expressed. And that nothing 'less than an executed instrument, or deed of manumission, by which a slave presently or prospectively is made free, is good within the statute.
I concur with the Court in the reversal.