Bowen, J.
The defense relied on, to prevent a recovery upon the notes, is a want of consideration to support them. The defendants have shaped their pleas and their evidence with a view of pro•senting that question to our consideration in its true aspect. There being no dispute as to the facts which induced the giving of the notes, we may proceed at once to an examination of the points which naturally arise out of those facts.
The plaintiff claimed that Poindexter was his slave, and agreed to set him free for four hundred dollars, secured by the notes of the defendants. It is fair to infer that the several parties who became bound on the notes, believed, at the time of signing them, that the plaintiff’s claim of dominion over Poindexter was valid. They doubtless acted upon that conviction. What motive actuated •the plaintiff does not appear, except that he seems to have been willing to part with his right over the slave for the sum mentioned. He received from him these notes as the price of his manumission. This naturally leads to the inquiry, whether Poindexter was, at the time, a slave, or whether that relation toward the plaintiff, if it ever existed, had not been severed by the acts of himself? It is shown that Poindexter had lived with plaintiff seven or eight years, and had been called a slave, but during that period he had, several times, been sent by his master into this state on business, 627] and ^afterward returned and continued in his service. His actual condition, at any time while he lived with the plaintiff, is not manifest from anything shown in the case. It-does not appear how long he had been in servitude, nor does any presumption unfavorable to his freedom arise from-proof of his color. For aught' that appears he may have been a free white man, supposing himself bound to service. But, regarding him as a slave, before he came into this state by the consent of plaintiff, what effect did that transfer of him from slave to free territory have ? Some enlightened jurists in the slave states admit that if the master take his slave into a free state to reside permanently, that he thereby be-.co mes emancipated, but, at the same time they hold that if he go •there with him for a temporary purpose, although he may, while in -free territory, be suspended in his rights of owner over him, yet .if the servant return voluntarily into the state where he was legally *628 •held to service, the rights and powers of the master re-attach as ■fully as they existed before. This distinction between the effect of a temporary and a permanent removal of slaves is maintained upon the ground that the property of an individual does not cease to belong to him on account of his being in a foreign state, and it is still a part of the wealth of the state from whence it came, and that the moveables of the stranger are held and pass by the laws of his own ■country, and hence the case of a sojourner is different from that of one who moves into a country with the intention of residing there.
The former is subject only to particular laws, and has the title of his property secure, while he who enters and actually resides, is subject to every law. Rankin v. Lydia, 2 A. K. Marshall, 813.
The soundness of this principle, in its general application to property, will not bo dented. But the common law confers no right of proj)orty in persons. It can exist only by «municipal author- [628 ity. Slavery is entirely local in its character, and is repugnant io reason and the principles of natural law, wherever it subsists. 1 Bla. Com. 423. Hence the same rules that would govern ordinary chattels, in their transit from one country into another, and by the comity of nations be enforced for the protection of their owners, do not apply to human beings, over whom no exercise of the rights of ■ownership can be asserted by either the natural or the revealed law. The sole foundation for the exercise of any such right rests in force and wrong; therefore it can not be extended beyond the limits of the government which ordains it. Other countries do not encourage it in any foi*m. The law of England abhors and will not endure the existence of it within the realm, and the instant a slave lands there, he becomes a freeman. 1 Bla. Com. 424. Sir William Draper Best, in Forbes v. Cochran, 2 Barn. & Cress. 448, says: “If a man wishes to preserve his slaves, let him attach them to him by affection, or make fast the bars of their prison, or rivet well their chains, for the instant they get beyond the limits where slavei-y is recognized by the local law, they have broken their- chains, they have escaped from their prison, and are free.”
The Supreme Court of Louisiana has adopted the English doc-doctrine on this subject, and overthrown the distinction attempted to be drawn between the temporary removal of slaves into free states, and the taking of them there with the intention of their becoming residents.
In the case of Marie Louise v. Marat, 9 La. 473, the plaintiff’s *629, 630 daughter was taken by her master to Prance, and afterward returned to the State of Louisiana. The court say that if she was taken by the person claiming her services as a slave, to a foreign country, whore slavery docs not exist, and is not tolerated, and by 629] the laws of *which such slave would be entitled to her liberty, for the purpose of her residence, even temporarily, the person taken to such country would become free, and that freedom once impressed upon an individual was indelible, and the status or condition in society of such party could not be changed; for being free for one moment in France, it was not in the power of her former-owner to reduce her. again to slavery.
In Frank v. Powell, 11 La. 499, it was hold that a slave brought into the State of Ohio, whose law forbid? slavery and involuntary servitude, and placed in service by his owner to an innkeeper, becomes free and emancipated by the operation of law, and his former-owner, by whose agency his removal is effected, must be presumed to have consented to all of the necessary legal consequences resulting from his removal to another state, under the operation of its-laws.
In Priscilla v. Smith, 13 La. 341, it was held that where a slave was taken from Louisiana with the consent of the owner to France, although afteward sent back, she was thereby entitled to her freedom from the fact of having been taken to a country where slavery-is not tolerated, and where the slave becomes free by landing on the French soil.
To the same purport is Lunsford v. Coquillon, 14 Martin, 401; Louis v. Caharrus, 7 La. 170; Thomas v. Geneies, 16 La. 483; Vaugh v. Williams, 3 McLean, 531; The matter of Ralph, 1 Morris (Iowa), 1; Sommersett’s case, 20 State Trials, 1; Forbes v. Cochran, 2 Barn. & Cress. 448.
In Massachusetts, it was held, in 1836, that if a slave be voluntarily brought into that state by his master, or comes there with his 630] consent, he becomes free, and can, not be *coerced to return. Commonwealth v. Avis, 18 Pick. 93; Commonwealth v. Taylor, 3 Met. 72.
In Connecticut a similar decision was made in 1837. It was tbo case of a female slave brought by her master from Georgia for a temporary residence, and the court held that the master having left the slave in Connecticut, on a temporary absence from the state, she became forthwith free. Jackson v. Bullack, 12 Conn. 38.
*631 In this state not only are our institutions and usages, and the sentiments of our population opposed to, and at variance with the institution of slavery in whatever form it may assume* but the ordinance of July 13,1787, for the government of the territory northwest of the river Ohio, prohibits, in express terms, its introduction here for any purpose whatever. By its imperative language it is denied any vitality on our soil. Its manacles instantly break asunder and crumble to dust, when he who has worn them obtains the liberty from his oppressor, and is afforded the opportunity by him of placing his feet upon our shore, and of breathing the air of freedom. To the terms of this ordinance, in this respect, all of our laws, subsequently enacted, have conformed. There has never been a period during our slate government, when a slave could for one single moment, by the consent and act of its owner, be placed and continued in bondage here.
If we look to the reason of the rule which controls personal ' property, and to the comity of nations and states which guarantees security to its owner, we experience no difficulty in confining its operations to things which, in all countries, are proper subjects of acquisition and of ownership, and of excluding it from objects not embraced within the term property, as understood and defined by the common law. In the one case it is the exercise of a natural *right, coeval with man’s existence, and consistent with the [681 laws of the Creator and the principles of justice. In the other it is the maintenance of a claim to, and the exaction of service from, another by force and oppression, by a violation of laws and principles, both human and divine, under the sanction of local and peculiar legislation.
Kentucky can not, by the law of comity, demand of this state an abrogation of its constitution and municipal laws, to promote any of its own peculiar institutions, or interests; nor can Ohio make any such demand of Kentucky. Neither the obligations of duty, nor the principles of humanity, which all civilized nations recognize, in certain cases, as due from one to the other, can over warrant the making of such demand.
Strengthened, therefore, as we find the case to be, by the clearest principles of natural law, and by the decisions of courts of high character, we have no hesitation in arriving at the conclusion that Poindexter, in coming into this state by the consent and license of his master, obtained thereby the freedom of which he had been *632 before deprived by local municipal legislation. His servitude, from ■that hour, ceased, and there is no law which can bring into operation the right of slavery when once destroyed. No right to a slave can be revived after the right has passed to the slave himself, .and he has become free. His subsequent return to the plaintiff, in Kentucky, could produce no such result. For, says Justice Mills, in Rankin v. Lydia, ubi supra, “ shall it be seriously contended that so soon as he transported her to the Kentucky shore, the noxious atmosphere of this state, without any express law for the purpose, clamped upon her newly-forged chains of slavery, after the old ones were destroyed ? For the honor of our country, we can not, for a moment, admit that the bare tendency of its soil is thus dangerous to the degraded African.”
*The court below properly gave judgment for the defendants for another reason. By the laws of Kentucky, no slave can make a contract with his master, or with any one else, for any purpose whatever. He can not bargain even for his freedom, and bind himself, or others for him, by contract. All agreements of that character are held to be void. Thus, in Willis v. Bruce, 8 B. Mon. 548, the court of appeals held that a promise to, or an executory contract with a slave by his owner, that he should be emancipated, is not obligatory, and can not be enforced, either at law or -in ■equity. Slaves can be emancipated in no other way than such as is prescribed by law. Dunlap v. Archer, 7 Dana, 31.
For this, as well as for the other reason above given, we are of ■opinion that the judgment of the district court should be affirmed.