REDMOND (of color), Plaintiff in Error, v. MURRAY et al., Defendants in Error.

1. An executory contract entered into by a master with his slave, by which the former agrees to manumit the latter upon the payment of a certain sum of money, is void and incapable of enforcement.
2. Slaves can be emancipated within this state only in the mode prescribed by statute.

*Error to Lewis Circuit Court.*

This was a suit by one Redmond, a man of color, against Edward C. Murray and Edward B. Osborn. Plaintiff set forth in his petition that on the 10th of January, 1855, he and his then master, Osborn, entered into a contract and agreement in writing, whereby said Osborn promised and agreed that if said plaintiff would pay said Osborn the sum of five hundred and fifty dollars and interest at ten per cent. from the date of a bill of sale held by said Osborn from one

Conroy dated July, 1852, he (Osborn) would give said plaintiff his freedom; that, at the time of entering into said agreement in writing, plaintiff paid said Osborn the sum of five hundred and one dollars; that in August, 1855, he, through another, made Osborn a tender of the balance of said sum and the interest up to that date; that Osborn, disregarding his agreement, sold plaintiff to one Wigginton; that Wigginton sold him to the defendant Murray; that he is willing and ready to pay the balance to whomsoever may be entitled to the same; that in consideration of said agreement said Osborn gave him (plaintiff) his freedom for the space of some two years and six months; that plaintiff during that time was free to go wherever he desired; that therefore he was and is a free man, and that he is holden as a slave. Plaintiff asks "judgment for his freedom, and liberation, and for further relief," &c.

The following instrument accompanied and was made a part of the petition: "Lagrange, Mo., January 10, 1855. Received of Elijah Dehart and Remond the sum of five hundred and one dollars, it being a part of a sum of five hundred and fifty dollars, bearing ten per cent. interest from date of bill of sale held by said Osborn, which being paid he is to have his freedom. [Signed] E. B. Osborn."

The court sustained a demurrer to this petition.

*Glover & Shepley*, for plaintiffs in error.

I. The writing shows that the amount was paid by the slave and a third person. The reception of the money by a third person is a sufficient consideration for making of the agreement. If the contract has been fulfilled by said third person and the plaintiff, or either of them, by the payment or tender of the small remainder due, then the plaintiff, as the person beneficially interested, can ask to have the same enforced. The suit is a suit to declare that the defendants have no right to restrain plaintiff from his liberty; and any acts of defendants that would estop them in any suit from asserting a right, because it was inequitable for them to do

so, are equally efficient in this suit as in any other. It is not true that a slave can be free only in the statutory way. Solemn acts of the owner, which are inconsistent with the idea that the person is a slave, will estop him from setting up such a claim; as when the owner has conveyed land, or made a devise to the person claimed to be a slave. (Naylor v. Hays, 7 B. Monr. 478; Oatfield v. Waring, 14 Johns. 188; Hall v. Mullin, 5 Harr. & Jo. 190; Burke v. Gill, 6 Gill & Jo. 138; Durham v. Durham, 26 Mo. 507.) Under the circumstances, it is inequitable to allow defendant to assert a right over the person of the plaintiff which he by writing or by act disclaimed to have. (5 Mart. 494.) Here is a great wrong which ought to be remedied in some manner.

*Wagner*, for defendants in error.

I. There was no valid or sufficient consideration alleged. The plaintiff being a slave, all his property belonged absolutely to his master; therefore he could pay nothing. (1 Stewart, 320.) All his acquisitions and earnings belonged to his master. (2 Rich. 424.) A slave can not enter into any binding contract with his master. (9 Gill & Jo. 19; 6 Rand. 173; 1 Leigh, 72.) The agreement set forth is void. The slave had no capacity to contract. A slave can not become partially free. (1 Pars. on Contr. 327.) There could be no emancipation without writing. Slaves can only be emancipated in the manner pointed out by statute. (R. C. 1478, p. ——, § 1; Wheeler's Law of Slavery, 233; see Charlotte v. Chouteau, 11 Mo. 193.)

Ewing, Judge, delivered the opinion of the court.

This was a suit for the specific execution of an alleged contract entered into between the plaintiff and the defendant Osborn, whereby the plaintiff was to be liberated upon the payment by him to Osborn, his then master, of a specified sum of money. The petition sets out the agreement, and avers the payment of the larger part of the stipulated sum and a tender of the balance with interest; that, after the

payment of this sum, Osborn, in violation of this agreement, sold plaintiff to one Wigginton, who sold him to the defendant, Murray, as his slave; that in consideration of said agreement his then master, as plaintiff supposed, gave him his freedom for some two years and a half; and during that time he was free to go wherever he desired. He avers his readiness to pay the balance, and asks judgment for his freedom. The case is here on a demurrer to the petition.

There is no principle on which a court of equity could enforce a contract of this nature, which is not in conflict with the policy of our emancipation laws, and repugnant to the relation of master and slave, as it is recognized and protected by our legislature on the subject. The right claimed implies a legal capacity in the slave wholly incompatible with his *status* under our laws and the acknowledged rights of the master under that relation. The incapacities of his condition, as it respects any right to contract, to acquire and hold property, to be a suitor in our courts, and others of a like nature, suggest, at the threshhold of the inquiry, insuperable obstacles to the specific enforcement of an executory contract between the master and himself looking to his future manumission, even where there might be a complete fulfilment on the part of the slave.

Provision is made whereby a negro may institute proceedings to establish his right to freedom when unlawfully detained in bondage, but it applies only to such as are entitled to freedom; and no action lies to enforce an executory contract by which a mere promise of liberation is given to the slave.

It is unnecessary to consider how far, if at all, the mere act of entering into a contract with a slave recognizes his power or capacity; or whether it would imply any renunciation of the master's dominion over him; for the power of the master himself is restricted by statute by certain prescribed forms by which such dominion can only be effectually renounced and his slave raised to the *status* of a freeman. The restrictions thus imposed are emancipation; and the

conditions on which the master's privilege in this respect may be exercised when viewed as a part of our legislative policy on the subject, can scarcely be reconciled with the right of the master to emancipate his slave in any other than the statutory mode—namely, by last will, or by an instrument of writing under seal. That any other is impliedly interdicted, we think, is manifest from a consideration of the several provisions of the emancipation act, and is the only view that would seem to be in harmony with the various legislative acts intended, it would appear, to guard more effectually the relation of master and slave, while it exists, and which also concern the condition of the negro himself after he passes from the hand of his master into a state of freedom. Such is the exposition given by their own courts of the laws of other states similar to ours. (Dunlap v. Archer, 7 Dana, 31; 8 B. Monr. 551; 2 Harr. & Jo. 176; Weeks v. Cheer, 4 Harr. & Jo. 543.) In the case last cited there was a petition to the chancellor to decree the recording of a deed of emancipation, which, by reason of the death of the master of the petitioner, had not been recorded within the time required for the recording of certain kinds of instruments. The court say the statute was not designed to give relief in cases which were before without remedy, by enabling a party acquiring equitable rights, under a deed not operative in law for want of recording, to perfect these rights by applying to the chancellor to order the original instrument to be recorded; but it was intended to give an accumulative remedy to persons able to contract, and who by deed acquire rights which equity will protect with the power to protect these rights. "But," he proceeds, " by the laws of this state a negro, so long as he is a slave, can have no rights adverse to those of his master; he can neither sue nor be sued, nor can he make any contract or acquire any rights under a deed which a court of law or equity can enforce; and as it is the recording of the deed of manumission within the time prescribed by law which entitles him to his freedom, he continues a slave until it is so recorded, and conse-

quently can not go either into a court of law or equity for relief of any kind."

A court of equity can not enforce a promise by a master that he will emancipate his slave after a certain condition is performed, which condition has been complied with by the slave; as where, upon the purchase of the slave at an executor's sale, he is promised his freedom on the payment of his purchase money to his master. The jurisdiction of equity only extends to cases where the pauper has a *legal* right to freedom, but there is some impediment to the assertion of that right in a court of law. (Sawney v. Carter, 6 Rand. 174.)

Manumission is a mere gratuity under our laws, and a mere intention or promise by the master, not consummated in the manner pointed out by law, however solemn the form in which such promise may be made, can confer no power or capacity on the slave to have it enforced; it endows him with none of the attributes of a freeman; his condition or *status* is not in the least changed or affected in its legal relations; and there is nothing, therefore, of which the law can take cognizance, nor any ground on which the plaintiff can base his claim to relief, however strongly it might appeal, under circumstances of apparent hardship, to conscience or the moral sense.

Judgment affirmed; the other judges concurring.